## CUDAHY PACKING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 2009.

Circuit Court of Appeals, Tenth Circuit.

Jan. 30, 1941.

Rehearing Denied March 21, 1941.

---

J. O. Emerson, of Kansas City, Kan.
(Thomas Creigh, of Chicago, Ill., and Fred
Robertson and Edward M. Boddington,
both of Kansas City, Kan., on the brief)
for petitioner.

Chas. A. Graham, of Denver, Colo. (Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Joseph Friedman and Edward J. Creswell, all of Washington, D. C., Attys. for National Labor Relations Board, on the brief), for respondent.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This proceeding comes here upon the petition of the Cudahy Packing Company[1] to review and set aside an order of the National Labor Relations Board[2] issued against the Company pursuant to § 10 (c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. In its answer to the petition the Board has requested enforcement of its order.

The Company is a Maine corporation, having its principal place of business and its executive offices in Chicago. It is engaged in the purchase and slaughter of livestock and the processing and marketing of meat and its by-products. One of its slaughtering and meat packing plants is located in Kansas City, Kansas.

On June 7, 1937, a petition was filed with the Regional Director of the Board by the United Packing House Workers, Local Industrial Union No. 194,[3] alleging that a question affecting interstate commerce had arisen concerning the representation of employees of the Company at its Kansas City plant, and requesting an investigation and certification of representatives pursuant to § 9(c) of the National Labor Relations Act. On June 23, 1937, the Board ordered an investigation and directed the Regional Director to conduct such an investigation and to provide for an appropriate hearing upon due notice. Hearings were held at Kansas City, Missouri, on July 19, 20, 21 and 22, 1937. Leave was granted to the Packing House Workers Union[4] of Kansas City to intervene. The Company filed its answer denying the jurisdiction of the Board asserting that interstate commerce was not affected.

On January 11, 1938, a charge of unfair labor practices was filed on behalf of the United. The Board, through its Regional Director, issued its complaint January 15, 1938, against the Company, alleging that it had and was engaged in unfair labor practices affecting commerce within the meaning of the act. The charges of unfair labor practices were that the Company had dominated and interfered with the formation and administration of PHWU and had contributed support thereto; that the Company by intimidation had prevented its employees from joining and continuing membership in United, and had coerced, urged and influenced them to join PHWU, in violation of their rights guaranteed by §§ 7 and 8 of the act.

The Company filed its answer denying the jurisdiction of the Board and the averments of unfair labor practices. PHWU intervened and filed its answer denying the allegations of the complaint of unfair labor practices with respect to its formation and administration. On February 1, 1938, the Board issued an order consolidating the two cases. Hearings were held on February 3, 4, 5, 7, 8, 9, 10, 11, 14, 15, and 17, 1938, before a trial examiner appointed by the Board. The Board, the Company, and PHWU were represented at these hearings by counsel and participated in the hearings. On February 8, 1938, permission was granted counsel for the Board to amend the complaint so as to charge the Company with unfair labor practices in the discharge of three employees.

The trial examiner filed an intermediate report May 13, 1938. He absolved the Company from the charge of unfair labor practices in the discharge of the three employees, but found that it had been engaged in unfair labor practices affecting commerce, and recommended that the Company cease and desist therefrom and take certain affirmative action to remedy the situation brought about by such practices. Objections were filed to the intermediate report by the Company and by PHWU. Oral argument was had before two members of the Board, and on August 3, 1939, further argument was heard by the Board upon the request of the Company.

The Board approved the intermediary findings of fact of the trial examiner and made findings of fact and conclusions of law. It found that the Company had dominated and interfered with the formation and administration of PHWU and had contributed support to it; that it had interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in § 7 of the act, and was therefore engaged in unfair labor practices with-

---

[1] Herein referred to as the Company.
[2] Herein referred to as the Board.
[3] Herein called the United.
[4] Herein called PHWU.

in the meaning of §-8 (1) of the act; that because of the domination exercised by the Company over it, PHWU could not serve the Company's employees as an effective bargaining agency. · Based on these findings and conclusions, the Board issued its order directing the Company to:

*1.* Cease and Desist from:

(a) Dominating or interfering with the administration of PHWU or with the formation or administration of any other labor organization and from contributing support thereto;

(b) Recognizing PHWU as the representative and bargaining agency of the employees;

(c) Giving effect to any contract or arrangement with PHWU concerning wages, hours and working conditions;

(d) Interfering or coercing its employees in the exercise of their rights to self-organization into any labor organization.

*2.* Take the following affirmative action:

(a) Withdraw all recognition from PHWU as a representative or bargaining agency of any of its employees;

(b) Post notices in conspicuous places throughout the Kansas City, Kansas, plant and maintain such notices for a period of at least sixty days that it will cease and desist as required by the Board;

(c) Notify the Regional Director for the Seventeenth Region, in writing, within ten days from the date of this order, of the steps the respondent has taken to comply herewith.

The order dismissed the amended complaint insofar as it charged the Company with unfair labor practices in the discharge of the three employees. It further provided for an election to determine the bargaining agency of the Company's Kansas City plant to be taken by secret ballot and to be held at such time as the Board should in the future direct.

On November 10, 1939, Local Union No. 10 of the Packing House Workers Organization,[5] affiliated with the Congress of Industrial Organization, asked to intervene and have its name substituted in place of United. The basis for this application was that the two were the same organization, United having changed its name to Local No. 10. The Company resisted the application and demanded a hearing thereon. No hearing was held by the Board, but after considering the application the Board granted it and the substitution was made.

■ *Substitution of Local No. 10:* It is urged that the Board was in error in permitting the intervention of Local No. 10 and the substitution of its name in the place of United in the proceedings, without granting the Company a hearing on such application. Local No. 10 filed a motion for intervention and substitution of name, supported by the affidavit of Elmer G. Williamson. The affidavit recited that in May, 1937, there was an organization of the employees in the Company's plant at Kansas City, known as United Packing House Workers; that on receipt of a charter from the Congress of Industrial Organization on June 21, 1937, its name was changed to the United Packing House Workers, Local Industrial Union ·No. 194; that on February 7, 1939, the name of the organization was changed to United Packing House Workers of America, Local Union No. 10, of the Packing House Workers ·Organization Committee, affiliated with the Congress of Industrial Organization, by which name it was then known; that the three named organizations were one and the same; that each was the successor to the other, the change being in name only. The affidavit recited that the affiant had been the president of each of the three organizations when the several changes were made.

The Company filed a written protest to the application for change of name; it filed no verified denial of the facts set out in the affidavit in support of the application. In fact, no positive, direct denial was made of the facts as set out in the affidavit. All that the Company's unverified written protest stated was that: "Said the Cudahy Packing Company *represents* in support of said protest and challenge that said movant is not even a labor organization, and if it should be found to bear any of the aspects of such an organization that it is an entirely different entity and organization from the one that has been connected and identified with the above entitled matters in said cases Nos. C–650 and R–208."

The. only conclusion that can be reached from the record is that Local No. 10 was the same union as United. We fail to see wherein the Company was injured by the refusal of the Board to grant a hearing on the application for a substitution of the new name of the union.

---

[5] Herein referred to as Local No. 10.

■ *Jurisdiction:* It is urged that the Board is without jurisdiction because a labor dispute in the Company's Kansas City plant would not affect interstate commerce. The facts establish that the Company is engaged in the purchase and slaughter of livestock and the processing and marketing of meat products. Its activities include the refining of vegetable oils and the production and sale of shortening and cooking and salad oils; the manufacture and marketing of soaps and cleaning powders; the marketing of wool and tanned sheep skins; the purchase, packing and sale of eggs, poultry and cheese; the purchase of cream and butter and the manufacture and sale of butter, margarine and ice cream; the mining of rock salt; and the operation of brine wells. The Company owns, maintains and operates a large number of refrigerator and tank cars for the transportation of its products. Its plants are located in Nebraska, Kansas, Iowa, Colorado, Utah, New Jersey, Minnesota, California, Michigan and Georgia. In addition, the Company operates produce collecting and processing plants in many states and has approximately 80 branch houses located in the principal cities of the United States. In its Kansas City, Kansas, plant, in addition to the slaughtering and processing of livestock, the Company cans meat products. This is the only one of its plants where meat is canned. Here it receives products for processing from plants located in other states, including Iowa, Minnesota and Nebraska. It is also the only plant where the Company manufactures margarine.

Approximately fifty per cent of the livestock slaughtered in the Kansas City plant is shipped to Kansas City from states other than Kansas, and approximately eighty to ninety per cent of the processed products of the Kansas City plant are shipped to points outside the state of Kansas. During the six months ending July 31, 1937, the Company slaughtered 54,597 cattle, 94,995 hogs, 54,136 calves, and 175,321 sheep at its Kansas City plant. During this period of time an average of 1,237 persons were employed there. The sales at the Kansas City unit during the fiscal year 1937 approximated $28,000,000 and the pay roll there was approximately $1,704,526. From this, it clearly appears that the Kansas City plant is engaged in interstate commerce.

■ The basis for the Company's contention that labor disputes in its Kansas City plant would not affect interstate commerce is that there are other similar plants engaged in the same business in Kansas City, Kansas, that are not running at full capacity, and that if the Company's Kansas City plant were closed down, all the interstate commerce done by it would readily be done by the other plants in Kansas City and that therefore interstate commerce would not be affected. Obviously, the Company's plant at Kansas City is now engaged in interstate commerce. It is difficult to conceive that in the event of a dislocation of this business at the Company's Kansas City plant it could be taken over in its entirety by some other like concern without serious effect on the many ramifications of interstate commerce. But even if it could, that is not the gauge by which to test the jurisdiction of the Board. The test is whether the Company under consideration is engaged in interstate commerce and whether a labor dispute would affect such commerce. The fact that such commerce might be taken over by some other concern may not be considered in determining the jurisdiction of the Board.

■ *Unfair Labor Practices:* From 1921 to the adoption of the National Labor Relations Act the relations between the Company and the employees in its various plants were regulated through what was known as the Conference Board Plan. Under this plan a conference board was set up in each plant. It consisted of representatives, elected by the employees in the plant, together with an equal number appointed by the Company. These, together with the chairman, who was the superintendent of the Company, constituted the local plant board. The employee representatives of each plant conference board elected a number of representatives on an approved basis to the general conference board. These again together with an equal number of Company representatives, constituted the General Conference Board. While the plan provided that there should be one regular meeting yearly of the General Conference Board, both the time and place of such meetings were left to the designation of the Company's president. Special meetings of the General Conference Board might also be called by the Company's president whenever, in his opinion, any matter coming before any plant Conference Board affected other plants of the Company. The local boards were supposed to hold monthly meetings. They had the right to make recommendations to the

general board; methods of arbitration were provided for; the expenses of the members of the General Conference Board incident to travel in attendance at a board meeting were paid by the Company. The employees of the various plants were informed of the activities of the general board through a publication called "Force," edited and distributed to all the employees by the Company.

The constitutionality of the Wagner Act was declared by the Supreme Court on April 12, 1937. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. On or about April 17, 1937, five employees of the Kansas City plant, all of whom were or had been members of the Plant Conference Board, received letters from members of the Plant Conference Board at the Company's St. Paul, Minnesota, plant, advising that the St. Paul group was promoting an employees' union. A copy of the St. Paul plan was enclosed in the letter. Charles Allison, a member of the local conference board, received such a letter. He contacted Philip Beil, Floyd Stark and Mr. Holtzman, all members of the local conference board, with a view to forming a company union. An organization meeting was scheduled at Drexel Hall for Sunday, April 18, 1937. The use of Drexel Hall was secured by Henry Schuster, a foreman in the Company's plant. Allison invited Theodore Heuck, the Company's plant superintendent, to attend this meeting. Allison informed him that the men wanted the benefit of his advice. Heuck stated that he would come as an individual, but not as an executive of the Company. He attended the organization meeting and entered into some of the discussion, the nature of which it is not necessary to consider. Following the meeting at Drexel Hall, PHWU was organized. It was patterned after the St. Paul plan, of which copies had been sent to the sponsors by the St. Paul group. In many respects it was similar to the old conference board plan. Membership was limited to the Kansas City plant and the election of representatives was on the basis of plant electoral divisions, the same as under the conference board plan. It contemplated no affiliation with any other union.

On April 19, 1937, the president of the Company issued a letter to all of the employees. This was distributed to the employees in the Kansas City plant through the publication "Force." In this letter he said: "Out of this discussion there may come not a little ill considered expression as to what the effects of the Act may be so far as American industry and its workers are concerned." Again, he said: "It is probable that in some instances individuals who hold positions of responsibility in labor circles, in their first sense of gratification over the advantages gained by labor as a result of the Supreme Court's approval of the Act, may become over-enthusiastic and misinterpret the provisions of the Act and mistake the gains it guarantees for license to overstep the boundaries established by justice and a fair deal for all concerned, the employer as well as the employee." Further on, he said: "May I suggest, too, that in these times of change in the general conception of the relations between worker and employer we, of the Cudahy organization, will do well to keep to our charted course of industrial relations by which we have progressed steadily for so many years.

"Further it seems to me that until the rules and regulations embodied in the Wagner Labor Relations Act are known and understood thoroughly, it is the part of good judgment to maintain our accustomed way and not be unduly influenced by the developments of the moment."

At the time this letter was transmitted and received, the sponsors of PHWU were actively engaged in soliciting members for their union. Allison and Beil, former employee members of the conference board, were very active in the solicitation for membership in this union. Both had received letters from St. Paul, which they had discussed with Heuck. The campaign for membership was carried on intensively during working hours at the plant. Foremen, assistant foremen, straw bosses and floor ladies of the company actively participated in the campaign for membership in PHWU. These activities were carried on within the plant and during working hours.

On April 29, 1937, the organization committee of PHWU wrote the Company and requested recognition as exclusive bargaining agency of the employees in the Kansas City plant. This was granted by Heuck the next day. Before he granted recognition, he had a long distance call with the Chicago office. At this time PHWU had not been formally organized. Its formal organization was not completed until on May 10, 1937, and at that time the recogni-

tion as bargaining agency, granted on April 30, was reconfirmed. On May 21, 1937, representatives of United conferred with Heuck, stating that they had enrolled a majority of the employees, and requested exclusive bargaining rights. Heuck replied that he would have to consult his superiors in Chicago. Following this meeting, Heuck phoned the superintendent at Chicago and told him what had transpired. A second meeting was held by representatives of United with Heuck at which he stated that PHWU had been granted recognition and suggested that United should make a showing of their membership. He was asked if that would do any good, to which he replied that he could not say that it would.

At the hearing, the Board offered a goodly number of employee witnesses, from whose testimony the following appears:

Nick Callowick, an employee, was president of PHWU. He was active in soliciting members for PHWU. He circulated petitions throughout the plant and solicited membership in the plant. William Flenker, the foreman of one of the departments, was present when Callowick was signing up the employees in his department. The foreman ordered the employees to take the petition around. Flenker told Carl Winterringer, an employee in the department, that the list of signers had to be turned in to the Superintendent's office. Flenker told Winterringer that the PHWU petitions were being circulated on the superintendent's instructions. Callowick went through the plant circulating petitions for membership in PHWU. He would be gone from his work two or three hours over a period of three or four days and the foreman would say nothing. He went into most of the departments for the purpose of soliciting members. In one department he asked the foreman if he could call on the employees there and the foreman said that he had to go somewhere and what he didn't see wouldn't hurt him. He came into the beef killing department and sat at the foreman's desk. The foreman was present, leaning on the desk, while Callowick sat in his chair. The foreman stopped work so that the employees could hear the reading of the contract. In May, Callowick came into the beef killing department with some papers and folders which he laid on the foreman's desk. He spread them out and the foreman called the men over to the desk, telling them Callowick was taking names for the union. He made several more visits to the department, on each of which he used the foreman's desk. The foreman was present and talked to Callowick at these times. On one visit to this department, Callowick asked Wayne Smart, an employee, to join the union, but he refused. The foreman, Herman Rodler, was present. Callowick said, "Don't you know this company will never be run by any outside organization?" Joseph Simmons, an employee in the sheep offal department, testified that Callowick used the department head's office in signing up employees for PHWU.

Tom Joyce, an assistant foreman in the sheet metal department, approached Elmer G. Williamson and others at work in the department and told them to sign up with the PHWU or they would be "crying like a whipped baby before long." In May, Charles Pluckett was approached by Joyce and asked to join PHWU. Joyce circulated the petition for membership through his department. The next day after Pluckett had been asked to join, a notice appeared on the bulletin board announcing that anyone who wished to sign the petition should call at the mechanical department foreman's office.

Jesse Hodges, department foreman of the canning department, told Chas. C. Seever, an employee of the department, to hurry back down to where he worked; that there was a man down there who wanted to see him; that the man wanted him to join the company union. Seever replied that there wasn't any need of joining the company union because he had joined the C.I.O., to which Hodges replied: "What in hell did you join them for?"

Walter Blevens, Secretary of PHWU, came into Hodges' department and talked to him and after the conversation Hodges came out and asked Lawrence Ceselski, an employee in the department, to sign up for the union. Hodges talked to the other men in the department, after which they went into the office where Blevens was. Hodges told Stephen Yarmek, a worker in the canning department, that it would be pretty hard on him if he wore a C.I.O. button. The straw bosses in the department, including Hodges, wore PHWU buttons. Hodges asked Marvin Madden, an employee in the department, if he had signed up with the company union. When he replied that he had not, Hodges told him

to go into the scale shack and sign up. Bob Beeson, the foreman of the labeling room in the canning department, approached Emma Gillette in May with a paper and asked her to sign for the company union. At first she declined and he took the paper around the department, consisting of fifty or seventy-five employees, and got all their signatures. Then he returned it to her, and she then signed. Beeson told her that he wanted to get the signatures right away because Mr. Lewis, departmental superintendent, wanted the paper back by noon. Walter Blevens attempted to procure the signature of Mary Horn, an employee in the canning department, to the petition for membership in PHWU. He used the desk of Anna Millage, the floor lady, who was present while he was soliciting her signature. The floor lady handed Mary Horn the slip and told her everyone else had signed and that she might just as well sign it, too.

Herman Rodler, the assistant foreman in the beef killing department, asked Marcellino Garcia, an employee of that department, if he had heard anything about the union he was supposed to join. He replied that he had not, whereupon Rodler stated that there were going to be two unions; that there was going to be an outside union and an inside union and that he thought it would be best for all the Mexican boys to join the Packing House Workers Union.

Pat Cushing, a straw boss, told Matt Kramer, an employee in the beef killing department, that he wanted to get him into his organization. Kramer replied, "Why, Pat, you are a boss," whereupon Cushing replied, "We want to get all the members we can and put this over, because we want to best the C.I.O. and also get as near the conference board as we can." Kuncel, a department superintendent, relieved a number of the men in his department at various times, directing them to attend a PHWU speech in the dressing room.

■ The Act provides that the findings of the Board shall be conclusive on appeal if supported by substantial evidence. Sec. 10(e) (f). Our inquiry therefore is limited to whether the findings of the Board are supported by such evidence.

In his message of April 19, which the president of the Company addressed to all the employees, he told them he thought they would do well to keep to their charted course of industrial relations. The natural inference which the employees would draw from this letter was that the president was opposed to any organization which materially changed these relations. And, while Heuck testified that he attended the organization meeting at Drexel Hall in his individual capacity and not as a representative of the company, yet under all the circumstances as revealed by the evidence in this case, it might be difficult for the employees to forget that he was plant Superintendent of the Company, and they could well infer from his presence at the organization meeting and his participation in the proceedings, no matter what his motives were, that the undertaking had the approval and support of the Company.

The difference in treatment accorded PHWU and United by the Company clearly indicated the leaning of the Company toward PHWU. Every opportunity seems to have been accorded the organizers of PHWU to solicit members among the employees, not only in the plant but during working hours. No such privileges were extended to United. In many instances foremen and straw bosses actually solicited and endorsed membership in this union. In other cases they exhibited their approval by their acquiescence in the membership drive. All this was bound to influence the decision of the workers.

■ The Act condemns as unfair labor practices such activities as were engaged in by the foremen, assistant foremen and floor ladies of the Company, insofar as the employer may gain any advantage from them in the bargaining process of a kind which the Act proscribes, and to such extent the employer is held responsible for such acts and is within the reach of the Board's power to prevent a repetition thereof and to remove the consequences flowing therefrom upon the employees' right of self-organization. H. J. Heinz Company v. National Labor Relations Board, 61 S.Ct. 320, 85 L.Ed. ——, decided January 6, 1941, by the Supreme Court.

All of the acts narrated herein tend to support the conclusion reached by the Board, that the Company had been guilty of unfair labor practices within the meaning of the Act.

■ True, there was a sharp conflict in the evidence. The Company produced a great deal of testimony to negative the testimony supporting the conclusions of the

Board. But the credibility of the witnesses, the weight to be given their testimony and the determination of the conflicts arising therefrom, were matters for the Board to decide.

Some of the subsidiary findings of the Board are not sustained by the evidence; others are clearly contrary to the evidence. However, the ultimate findings of the Board that the Company had dominated and interfered with the formation and administration of the Packing House Workers Union and had interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed by the Act, is supported by substantial testimony and may not be disturbed on appeal.

We have found that the order of the Board is founded on competent and substantial testimony and it is therefore not necessary to consider the charge that incompetent evidence was presented and admitted by the examiner.

And finally, it is urged that the course of the proceedings at the hearing was such as to deprive the Company of a fair hearing and that the Board was so biased and prejudiced that the Company could not have a fair hearing before it. A careful examination of the record establishes no basis for these charges.

The order of the Board is affirmed and will be enforced.

### On Petition for Rehearing.

The Cudahy Packing Company, a corporation, has filed its petition for rehearing in the above entitled cause. In its petition it challenges the statement in the opinion of the court that the application of Local Union No. 10 of the Packing House Workers Organization, affiliated with the Congress of Industrial Organizations, was supported by affidavit. It asserts that this statement in the opinion is not only not supported by the record, but is contrary to it. The order for the substitution of Local No. 10 is contained in the order of the Board providing for the calling of an election. It contains the following language:

"On November 10, 1939,[2] a motion and affidavit in support thereof were filed by United Packing House Workers of America, Local Union No. 10, of the Packing House Workers Organizing Committee, affiliated with the Congress of Industrial Organizations, stating that on February 7, 1939, the name of United Packing House Workers Local Industrial Union No. 194 was changed to United Packing House Workers of America, Local Union No. 10, of the Packing House Workers Organizing Committee, affiliated with the Congress of Industrial Organizations, by which name it is now known, and requesting that the Decision, Order and Direction of Election, and all proceedings herein, be amended in accordance with said allegation."

Note[2] states that: "The motion which is dated, and the affidavit which was sworn to, on November 6, 1939, were served upon the parties to the proceedings prior to their filing with the Board."

This finding of fact in the order of the Board stands unchallenged in the record. No motion was made to strike it from the order; no assignment of error was predicated thereon by Cudahy. In its written protest against the motion, Cudahy admits the receipt of a copy of the motion for substitution.

Assignment of error No. 5 by Cudahy relates to the substitution of Local No. 10. The assignment is as follows: "The Board erred to the prejudice of Cudahy Packing Company after the trial had been finished and the case taken under advisement and the decision rendered, in failing to give the Cudahy Packing Company any hearing on the intervention of the American Federation of Labor claiming it had a majority, and in ordering Local Union No. 10 to be made a party as a pretended successor of Union No. 194, which had been a party to the original proceeding."

Here again, no exception is taken to the statement of the Board that Cudahy was served with a copy of the application and the affidavit which was sworn to on November 5, prior to the hearing thereof. The only reference made by Cudahy to this question is found in its brief, where the following statement appears: "Although this application was not even verified and although protests were made against it and demands for hearing made, the Board paid no attention to the same."

Here again all reference to the finding of the Board that a verified supporting affidavit was served on Cudahy is studiously avoided. The objection of Cudahy to the statement that the application for substitution was supported by affidavit is not well taken.

We have given consideration to the petition for rehearing and the same is hereby denied.