# NATIONAL LABOR RELATIONS BOARD *v.* STOWE SPINNING CO. ET AL.

No. 46.   Argued December 9–10, 1948.—Decided February 28, 1949.

*Mozart G. Ratner* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, David P. Findling* and *Ruth Weyand.*

*Paul C. Whitlock* argued the cause and filed a brief for respondents.

Opinion of the Court by Mr. JUSTICE MURPHY, announced by Mr. JUSTICE RUTLEDGE.

The principal question for decision is whether the circumstances justified the finding of an unfair labor practice. A union organizer was refused the use of a company-owned meeting hall, and the union complained to the Board. After the usual proceedings, the Board found an unfair labor practice had been committed, 70 N. L. R. B. 614. The Court of Appeals refused to enforce the Board's order, 165 F. 2d 609, and the case is here on certiorari. A subsidiary problem is the breadth of the order we are asked to enforce.

*First.* We are asked to overrule the Board's finding that it is an unfair labor practice [1] to discriminate against a union by denying it the only available meeting hall in a company town when the Board finds that the "sole purpose" of the discriminatory denial is "to impede, prevent, and discourage self-organization and collective bargaining by the [company's] employees within the meaning of Section 7 of the Act."

North Belmont, North Carolina, is the home of the four respondents' mills. Interlocking directorates and family ties make the four equal one for our purposes.[2]

---

[1] Under the Wagner Act, 49 Stat. 449, 29 U. S. C. §§ 151, 158 (1).

[2] The Board found that "A. C. Lineberger is president of the respondents Perfection, Acme, and Linford; J. Harold Lineberger

Each of the mills owns a large number of houses in North Belmont which are rented to employees. At a central location are a school, a theatre, and a building housing a post office, all owned or controlled by the mill owners. In sum, North Belmont is a company town.

In December, 1944, Harris, a union organizer, appeared in North Belmont and began the first organization drive since the textile strike ten years earlier. He decided to begin with employees of respondent Stowe. A meeting hall was needed for the activity, and the post office building was the only choice open to the organizer—he was refused permission to use the school building, and was told that the theatre could be used only for motion pictures. Most of the post office building was erected by respondents for the Patriotic Order Sons of America, a "patriotic secret order to which any male citizen of the United States of good moral character" can belong. Many of respondents' employees are members; respondents check off monthly dues.

The Order's president, Baxter Black, told Harris that the proposed meeting might be held in the hall on the payment of a janitor's fee. Harris emphasized that he was willing to pay for the use of the hall. It is clear he was not asking special favors. Circulars were printed announcing the time and place of the meeting. Thereupon D. P. Stowe, for the four employer-owners, rescinded the permission granted—because Harris was a textile organizer. While the building seems to have been erected on the understanding that only the Patriotic Order might use it, that condition was never enforced

---

is vice president of the respondents Perfection and Linford, and secretary-treasurer of the respondent Acme; D. P. Stowe is vice president of the respondent Acme and secretary-treasurer of the respondent Perfection. The officers of the respondent Stowe are C. T. Stowe, president; C. P. Stowe, vice president; and R. L. Stowe, secretary-treasurer, all of whom are cousins of D. P. Stowe."

until Harris' union affiliation reached the ears of the owners. Until then the Order had handled its own affairs; Black had been sure that his permission was the final word on the matter.

The Board found that the refusal "to permit use of the hall . . . under the circumstances, constituted unlawful disparity of treatment and discrimination against the Union." The union's complaint also charged that several employees had been discharged because of union activity, and again the Board found for the union. The Court of Appeals enforced the reinstatement order, but refused enforcement of the order relating to the use of the hall. On the latter determination we granted certiorari [3] to resolve an asserted conflict with prior decisions of this Court.

Company rules in *Republic Aviation Corp.* v. *Labor Board* and *Labor Board* v. *Le Tourneau Company of Georgia,* 324 U. S. 793, forbade union solicitation on company property. Under the circumstances the Board found that these rules offended the Act, and we upheld the Board. Stowe tells us that its case is far removed from the principles established in those decisions: the Board is now invading private property unconnected with the plant, for a private purpose, in the very teeth of the Fifth Amendment. "From Magna Charta on down," we are warned, "the individual has been guaranteed against disseisin of his property." A privately owned hall is different from the parking lot involved in *Le Tourneau's* case.

In the sense suggested by Stowe, the Board finding goes further than those upheld previously by this Court. But in a larger sense it does not. We mention nothing new when we notice that union organization in a com-

---

[3] Stowe's petition was denied, 334 U. S. 831; the reinstatement order is not being reviewed in this Court.

pany town must depend, even more than usual, on a hands-off attitude on the part of management.[4] And it is clear that one of management's chief weapons, in attempting to stifle organization, is the denial of a place to meet.[5] We cannot equate a company-dominated North Carolina mill town with the vast metropolitan centers where a number of halls are available within easy reach of prospective union members. We would be ignoring the obvious were we to hold that a common meeting place in a company town is not an important part of the company's business. The question is of course one of degree. But isolated plants must draw labor, and an element in that drawing power is a community hall of some kind.[6] In the background of discrimination found by the Board in this case, we cannot say that its conclusion should be upset.[7] As we will point out below, the Board may weigh the employer's expressed motive in determining the effect on employees of management's otherwise equivocal act.

Stowe contends that its denial of facilities to the union was in accord with § 8 (2) of the Act, prohibiting employer interference with the formation or administration of a labor organization. One Board member agreed, citing a number of cases in which the Board had made a grant of company facilities the basis for unfair practice findings. But Stowe would have the cases hold more than they do. In each of them, granting such facilities

---

[4] See Lahne, The Cotton Mill Worker (New York, 1944), pp. 50–51.

[5] See MacDonald, Southern Mill Hills (New York, 1928), p. 34; Blanshard, Labor in Southern Cotton Mills (New York, 1927), p. 64.

[6] See notes 4 and 5.

[7] Respondents do not contest the Board finding that antiunion bias was the cause for their refusal of the hall. And four employees were discharged for union activity. See 165 F. 2d 609, 614. Even in the *Republic* and *Le Tourneau* cases no such discrimination was shown. 324 U. S. at 797, 801.

to the union was only one facet in a pattern of domination found by the Board.[8]  The opinion of the Board in this case states that the "mere granting of a meeting place to a union by an employer under the conditions present here would not . . . in and of itself constitute unlawful assistance to that union . . . ."  We have said that the Wagner Act "left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms."  *Republic Aviation Corp.* v. *Labor Board, supra,* 324 U. S. at 798.  Sections 8 (1) and 8 (2) of the Act would seem to run into each other in the situation before us, were we to forget that the Board is the agency which weighs the relevance of factual data.  Presumptions such as those employed in the *Peyton Packing Company* case, 49 N. L. R. B. 828, at 843–844,[9] may be important in cases like this one.  While the Wagner Act does not ask punishment for evil intent, repeated acts of discrimination may establish a natural tendency to view justifications of other labor practices with some skepticism.  Calculating a cumulative effect on employees is not a job for this Court.  We cannot

---

[8] See, for example, *Berkshire Knitting Mills* v. *Labor Board,* 139 F. 2d 134 (company union given use of hall denied to outside union); *Labor Board* v. *Carlisle Lumber Co.,* 94 F. 2d 138 (company union given preference over Board-certified bargaining representative); *Labor Board* v. *Norfolk Shipbuilding & Drydock Corp.,* 109 F. 2d 128 (recognition of inside union without ascertaining employees' wishes—inside union given use of company rooms); *Labor Board* v. *Lane Cotton Mills,* 111 F. 2d 814 (refusal to bargain with certified union coupled with use of recreation room by company union). And see *Cudahy Packing Co.* v. *Labor Board,* 118 F. 2d 295; *Matter of Standard Oil of California,* 61 N. L. R. B. 1251; *Matter of Virginia Electric & Power Co.,* 44 N. L. R. B. 404, enforced 319 U. S. 533.

[9] Cited and quoted with approval in the *Republic* case at 803, 804.

say that the Board was wrong as a matter of law in view of the setting.

The philosophy expressed in the Fifth Amendment does not affect the view we take. The Wagner Act was adopted pursuant to the commerce clause, and certainly can authorize the Board to stop an unfair labor practice as important as the one we are considering. Respondents are unquestionably engaged in interstate commerce within the meaning of the Act. It is not " 'every interference with property rights that is within the Fifth Amendment . . . . Inconvenience, or even some dislocation of property rights, may be necessary in order to safeguard the right to collective bargaining.' " 324 U. S. at 802.[10]

Accordingly, we think the Court of Appeals should have upheld the Board's unfair practice charge.

*Second.* Stowe's final contention, that the Board's order is too broad, is more serious. Stowe is ordered to "cease and desist from . . . refusing to permit the use of the Patriotic Order Sons of America hall by its employees or employees of [the other respondents] or by Textile Workers Union of America, C. I. O., or any other labor organization, for the purpose of self-organization or collective bargaining." There are none of the usual qualifications on the face of the order; [11] one construction would permit unions to use the hall at all times, whatever the legitimate activity of the Patriotic Order.

We are asked to read the decree in its background, and reject what is called a strained construction. Implicit in the order, we are told, is the word "reasonable."

---

[10] We pointed out that neither the *Republic* nor *Le Tourneau* cases "is like a mining or lumber camp where the employees pass their rest as well as their work time on the employer's premises, so that union organization must proceed upon the employer's premises or be seriously handicapped." 324 U. S. at 799.

[11] Compare *Labor Board* v. *Lake Superior Lumber Corp.,* 167 F. 2d 147, 150, where the Board recognized that the employer might impose "lawful and reasonable conditions."

Perhaps this is true. The words of even a judicial decree must be read in their setting. But violation of the order brings the swift retribution of contempt, without the normal safeguards of a full-dress proceeding. Some notice of the prior proceeding must be taken in a contempt action—the very word "reasonable" invites a glance at what has gone before. But too great dependence on the former action places defendants under a restraint that makes the order itself a useless formality. Again the question is of degree.

In this case, however, the Board did not find that the very denial of the hall was an unfair labor practice. It found that the refusal by these respondents was unreasonable because the hall had been given freely to others, and because no other halls were available for organization. Now the Board asks us to enforce an order that simply does not mean what it says. We must require explicit language making it clear that the mere denial of facilities will not subject respondents to punishment for contempt. What the Board found, and all we are considering here, is discrimination. The decree should be modified to order respondents to refrain from any activity which would cause a union's application to be treated on a different basis than those of others similarly situated.

We therefore direct the Court of Appeals to remand the case to the Board for amendment of its order to conform to the Board's findings and this opinion.

*Reversed and remanded.*

MR. JUSTICE JACKSON, dissenting in part.

I find myself unable to join the Court's opinion because I have a different view as to the nature of the unfair labor practice involved which leads me to a different conclusion as to the remedy that the Board may prescribe.

The employers' plant was located in a company-owned town. It contained only three buildings suitable for use

for a public meeting. The Union needed a meeting place and sought to use any one of the three.

One is a motion picture theater owned and controlled by the employers but operated by a lessee. The Union was refused its use upon the ground that it was available only for motion pictures.

Another was a school building publicly owned but controlled by a school board composed entirely from officers of the employers. The Union sought to use the schoolhouse but, after some negotiations, was told by its custodian that an officer of one of the employers had issued instructions not to permit such use.

The third was a building owned and controlled by the employers, occupied by the post office and a grocery store on the first floor and by a meeting hall on the second. This hall for some time had been the quarters of the Patriotic Order Sons of America, a fraternal organization which in practice had exercised full control over it and had permitted various other organizations to use it for community purposes. Its officers consented to the Union's use of the hall on the payment of a nominal janitor's fee. Before the scheduled meeting, however, an officer of the employers told the head of the fraternal order that he should not have allowed the use of the hall and caused the permission to be withdrawn. While the tenure of the fraternal organization is somewhat shadowy, it appears that it had been given at least such control of the use of the hall that its consent would have constituted a license so that the Union would not have been trespassing.

But for the interference of the employers, either the schoolhouse or the Patriotic Sons hall might have been obtained. I agree with the Court that the Board was justified in finding that the employers' action in preventing the Union from obtaining this place of assembly constituted an unfair labor practice. But I do not think this finding is or can be based on discrimination. The

employers, having permitted the Patriotic Sons to control use of the hall, could not properly interfere and command reversal of the Sons' approval of the Union's application. On these facts, such conduct would amount to an unfair labor practice, even though no other organization had ever been allowed to use the hall. The interference to oust the Union was enough without a discrimination, which could hardly occur unless some other union had been allowed to use the hall. Consequently, I think the Board could require the employer to notify the Patriotic Sons that it has been unfair in the objections heretofore made and that it will make no objections in the future, and that the Patriotic Sons are free to allow such temporary use if they see fit.

But the Board's order goes beyond this. It has ordered that the employers take affirmative action to place the hall of the Patriotic Sons at the disposal of the Union. It is one thing to forbid the employers to bring pressure on the custodian of the hall to shut out the Union; it is another thing to order them to bring pressure on the custodian to admit the Union, or to order the employers to repossess the hall and turn it over to the Union. If the employers were controlling the hall directly, I would have serious doubts whether denial of union use of the hall could be an unfair labor practice, and equally serious doubts whether it would not be an unfair labor practice under § 8 (2) of the Act to allow it. Neither the complaining Union nor any other has yet been chosen as bargaining agent for these employees. For the employers to provide this Union a hall, by direct permission or by indirect pressure on the Patriotic Sons, may readily convey to employees an impression of favoring the Union thus indulged. As the court below pointed out, the policy of the Act as heretofore applied is one of preventing the employer from extending financial aid or support to any union. I think, in the long run, interpretation of the Act

to require a complete hands-off attitude on the part of employers will better effectuate the purposes of the Act than an occasional departure from it to require some kind of aid to a union as an expedient for correcting or punishing an unfair labor practice.

If the Act permitted imposing such a penalty upon the employers, it would perhaps be appropriate to compel them to provide a meeting hall in lieu of those it kept the Union from obtaining. However, it is well established by decisions of this Court that § 10 (c) of the Act is remedial, not punitive. *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197; *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7. In both cases, Chief Justice Hughes said for the Court "this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." 305 U. S. 197, 235, and 311 U. S. 7, 11.

Consequently, I think the order should be modified to provide that the employer shall cease and desist from interfering in any manner with the discretion of the Patriotic Sons with respect to use of the hall and that appropriate notices shall be posted.

MR. JUSTICE REED, with whom THE CHIEF JUSTICE joins, dissenting.

The controlling point for decision in this case is whether the Board was justified in concluding that the four respondent companies interfered with rights guaranteed by § 7 of the Wagner Act. Section 7 provides that "Employees shall have the right to self-organization, to form, join, or assist labor organizations . . . ." 49 Stat. 452. The Board's complaint charged an unfair labor practice under § 8 (1) against the four respondent companies by

their interference with the rights guaranteed by § 7. The form of interference was the refusal of the use of a hall jointly owned by respondents to employees of one of them for the purpose of self-organization. If the four respondents violated § 7, did the Board have power to redress that violation by entering § 1 (b) and § 2 (c) of its order against Stowe and similar orders against the other three respondents? Section 1 (b) ordered the respondents to cease and desist from

> "Refusing to permit the use of the Patriotic Order Sons of America hall by its employees or employees of Acme Spinning Company, Perfection Spinning Company or Linford Mills, Inc., or by Textile Workers Union of America, C. I. O., or any other labor organization, for the purpose of self-organization or collective bargaining;"

And § 2 (c) ordered respondents to

> "Upon request, grant to its employees and employees of Acme Spinning Company, Perfection Spinning Company, or Linford Mills, Inc., and to Textile Workers of America, C. I. O., or any other labor organization, the use of the Patriotic Order Sons of America hall for the purposes of self-organization or collective bargaining;"

The Board decided that the refusal of the hall violated § 7 and concluded as a matter of law:

> "3. By interfering with, restraining, and coercing their employees in the exercise of the rights guaranteed in Section 7 of the Act, the respondents Stowe Spinning Company, Acme Spinning Company, Perfection Spinning Company, and Linford Mills, Inc., have engaged in and are engaging in unfair labor practices, within the meaning of Section 8 (1) of the Act."

238

The Court of Appeals accurately summarized the Board's action in these words:

"It [the Board] made the finding that the owner's refusal 'to permit use of the hall for purposes of self organization in a labor union under the circumstances constituted unlawful disparity of treatment and discrimination against the Union.' It pointed out that foremost among the methods universally utilized by employees in self organization is the exercise of the constitutional right of peaceable assembly. It held that the sole purpose of the respondents' action was to impede, prevent and discourage the employees in the exercise of this basic right and that by refusing the union permission to use the only available meeting place in the community, the respondents in fact deprived the employees of Stowe of the right." *Labor Board* v. *Stowe Spinning Co.,* 165 F. 2d 609, 611.

In reversing the Board the Court of Appeals said:

". . . the employer has not interfered with, restrained or coerced its employees in the exercise of their rights. Even though it was evident to the workers that the action of the owners of the hall was inspired by hostility to the union, the refusal did not amount to unlawful interference, restraint or coercion." *Id.,* 611.

A determination that as a matter of law it is or it is not an unfair labor practice for respondents to refuse the use of their hall for union organization purposes will decide this case.

The findings show that the center of the village of North Belmont is approximately 2½ miles from the center of the town of Belmont. In the village there are four textile mills and about each textile mill a number of houses that belong to the corporations that own the

respective mills. At a central location in the village, reached by what we assume are public roads and streets, are the school, a theater, and a combined post office and store; above the post office and store is the meeting hall in question. These facilities, except the school, are owned jointly by the four corporations that own the mills. Neither the record nor the findings show whether or not there is privately owned realty in the village belonging to others than the textile mills, but we assume that there is none.

Respondents provided the hall as a meeting place for the Patriotic Order Sons of America. The Board found, 70 N. L. R. B. 614, 621:

"As to the arrangements under which the P. O. S. of A. was permitted use of this company-owned property, Stowe credibly testified without contradiction that 'it was built especially for the Patriotic Sons of America to hold their meetings in and was not to be rented to anybody else.' He also testified: '. . . we told the Patriotic Sons of America that we were going to let them use the building free of rent, but were not going to allow it to be rented for any [other] purposes.' "

Under such an arrangement the members of the fraternal order were licensees, who were permitted to use the hall only by virtue of the owner's consent. There was the further Board statement, quoted below, as to the use of the hall.[1]

---

[1] "As a matter of practice, since 1937, the hall has been used, according to the credible testimony of Black, on numerous occasions for community and employee meetings. Various churches have used the hall for banquets; 'Ladies Aid' societies have gathered there; the North Belmont School had the use of the hall for at least one Christmas party; and for several weeks employees of the respondents attended a 'Safety school' held in the hall. That no other fraternal order met there is explained by the fact, established by Stowe's

It does not appear from the record how far this village center is from the respective mills. It is clear, however, that the Patriotic Order Sons of America hall is not connected with the mill operations, nor is its use open to employees because of their employment by any of the mills. There is a distinct line of cleavage as to the rights of employees between facilities and means of production open to the use of employees through their employment contract and other property of the employer that may be used by any person other than the owner only through some contract, license, or permission, not a part of an employment contract. The undisputed evidence discloses that membership in the fraternal order is not restricted to the employees of the mills, and that it includes others.

The error into which the Board fell concerning the right to use the Patriotic Order Sons of America hall is, it seems to us, that it thought the "disparity of treatment and discrimination against the Union" involved in the refusal of the hall was a violation of the employees' "right to self-organization, to form, join, or assist labor organizations." [2] § 7. It is only when there is a violation

testimony, that the P. O. S. of A. is the only such organization in North Belmont. Furthermore, Black's credible testimony is undisputed that it was the practice, when any other organization wanted to use the hall, for the P. O. S. of A. 'lodge' itself to pass upon the request. There is no evidence that any other organization, except the Union, was ever refused use of the hall, either by the P. O. S. of A. or by the respondents." 70 N. L. R. B. 614, 621.

[2] The Board said: "Moreover, irrespective of the respondents' motive, we are convinced, and find upon the consideration stated above, that by refusing to permit their employees to exercise the right to meet on company-owned property for the purpose of holding a union meeting, when no other suitable property in the community was available for the purpose, under the circumstances set forth above, the respondents have placed an unreasonable impediment on freedom of communication and of assembly essential to the exercise of employees' rights guaranteed by Section 7 of the Act. By their conduct

through an interference with or a restraining or coercion of employees' rights under § 7 that an unfair labor practice finding may be predicated on the employer's acts. The employer is not required to aid employees to organize. The law forbids only interference.

Employment in a business enterprise gives an employee no rights in the employer's other property, disconnected from that enterprise. As to such property, the employer stands on the same footing as any other property owner. As indicated above, that is the condition as to the Patriotic Order Sons of America hall. The refusal of this owner to allow the hall's use for union organization is not an unfair labor practice under §§ 7 and 8 any more than a refusal by any other private owner would be. As far as the hall is concerned, the relation of employer-employee does not exist between the mill owners and the mill workers. There cannot be an unfair labor practice as to the use of this hall under the applicable sections of the National Labor Relations Act.

Perhaps the ruling of this Court in *Marsh* v. *Alabama*, 326 U. S. 501, approaches closer to this problem than any other case. There Alabama punished a distributor of religious literature for trespass when she insisted on passing out the pamphlets on a private sidewalk, used by the owners' permission to enter stores and the post office. This Court reversed and held the application of the state law of trespass violated the Fourteenth Amendment. This Court held, p. 509: "Insofar as the State has attempted to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town, its action cannot stand." Certain ex-

---

in revoking the grant of privilege to use the hall and thus denying the use of the hall to the Union, the respondents Stowe, Acme, Perfection, and Linford interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act, in violation of Section 8 (1) thereof." *Id.*, 624.

pressions, set out below,[3] occur in the opinion as to the right to use private property for speech, press and assembly but they must be read in the light of the facts in the *Marsh* case. So read, or however read, they cannot be construed as a holding that the natural right of free expression or of assembly, guaranteed by our Constitution, is a delusion unless organizers and evangelists can commandeer private buildings for use in the propagation of their ideas. The *Marsh* case, in my view, goes no further than to say that the public has the same rights of discussion on the sidewalks of company towns that it has on the sidewalks of municipalities.

---

[3] "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. . . . Had the corporation here owned the segment of the four-lane highway which runs parallel to the 'business block' and operated the same under a state franchise, doubtless no one would have seriously contended that the corporation's property interest in the highway gave it power to obstruct through traffic or to discriminate against interstate commerce. . . . And even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property as a segment of the four-lane highway, operation of all the highway, including the segment owned by the corporation, would still have been performance of a public function and discrimination would certainly have been illegal.

"We do not think it makes any significant constitutional difference as to the relationship between the rights of the owner and those of the public that here the State, instead of permitting the corporation to operate a highway, permitted it to use its property as a town, operate a 'business block' in the town and a street and sidewalk on that business block." P. 506–507.

"In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute." P. 509.

There is nothing in this record that indicates a situation such as exists in employer-owned lumber camps or mining properties. Where an employer maintains living, recreation and work places on such business premises open to employees by virtue of their employment, it has been held that exclusion of union organizers from contact with the employees is an unfair labor practice and that the Board's ordering the employer to grant union representatives access in non-working hours to the employees under reasonable regulations is a proper means to effectuate the purposes of the Act. *Labor Board* v. *Lake Superior Lumber Corp.*, 167 F. 2d 147. It has never been held that where the employees do not live on the premises of their employer a union organizer has to be admitted to those premises. The present situation differs from the employer-controlled areas where employees both live and work in that here union organizers may solicit the employees on the streets or in their homes or at public meeting houses within a few miles of their employment. Employees are not isolated beyond the hours of labor from an organizer nor is an organizer denied access to the employees. After an organizer has convinced an employee of the value of union organization, that employee can discuss union relations with his fellow-employees during non-working hours in the mill. This gives opportunity for union membership proliferation. *Republic Aviation Corp.* v. *Labor Board* and *Labor Board* v. *Le Tourneau Company of Georgia*, 324 U. S. 793.

The present case differs from the *Le Tourneau* and *Republic* cases in that in those cases the problem concerned the right of an employer to maintain discipline by forbidding employees to foster by personal solicitation union organization on the grounds or in the plant of the company during the employees' non-working time. We held that, unless there were particular circumstances that justified such a regulation to secure discipline and pro-

duction, the employer must allow such discussion. *Republic Aviation Corp.* v. *Labor Board, supra.*

The Board now seeks an extension of this rule. It is argued that where the only readily available meeting place is a piece of property belonging to the employer, the Board may require him to permit his employees to use that meeting place for presentation of arguments for unionization. Even where the employer has allowed other organizations to use his property, I do not think that the words of the statute guaranteeing employees the right to organize and to form labor unions permit such an extension. Employment furnishes no basis for employee rights to the control of property for union organization when the property is not a part of the premises of the employer, used in his business. So to construe the statute raises serious problems under the Fifth Amendment. Would the theater, also owned by the mill proprietors, be subject to the union's user? Would that construction as applied in the finding and particularly in the earlier quoted sections of the order deprive respondents of their property without just compensation or force private owners to devote their property to private purposes, *i. e.,* union organization? Definite legislative language only would authorize such a construction of this statute. *United States* v. *C. I. O.,* 335 U. S. 106, 120–21.

Labor unions do not have the same right to utilize the property of an employer not directly a part of the employment facilities, that an employer has. The Board cannot require that such meeting places be furnished for employees by an employer under the terms of the Act. To require the employer to allow labor union meetings in or on property entirely disconnected in space and use from the business of the employer and employees is too extravagant an extension of the meaning of the Act for me to believe it is within its language or the purpose of Congress.

I would affirm the Court of Appeals.