## MARYLAND DRYDOCK CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 6094.

United States Court of Appeals
Fourth Circuit.

Argued July 3, 1950.

Decided July 29, 1950.

William D. Macmillan, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on brief) for petitioner.

Mozart G. Ratner, Acting Assistant General Counsel, National Labor Relations Board, Washington, D. C. (David P. Findling, Associate General Counsel; A. Norman Somers, Assistant General Counsel; Owsley Vose, Abraham H. Maller and Gerald F. Krassa, Attorneys, National Labor Relations Board, all of Washington, D. C., on brief) for respondent.

Before PARKER, Chief Judge and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to set aside an order of the National Labor Relations Board which found Maryland Drydock Company guilty of an unfair labor practice in forbidding the distribution of union literature on its premises. The company contends that it has no rule against the distribution of union literature and that it has never forbidden the distribution of such literature except on two occasions when the literature being distributed was of a defamatory and insulting character and was calculated and intended to bring its managing and supervising officials into ridicule and contempt and thus disrupt discipline.

The facts are that the company's employees were organized for the purposes of collective bargaining in a local union of the C.I.O.; and for four years or more prior

to October 31, 1947, this union had been distributing its official newspaper "The Maryland Drydocker" at the entrance gates of the company's premises without objection. On September 26, 1947, following the organization of a supervisors association, an article was published in the paper attacking this as a "scab" association and with it was published Jack London's abusive definition of a "scab". At another part of the paper was a statement that the company's president, a Mr. French, was "popularly known as Goosie". On October 20 an article in the paper said that French should not be called "Goosie"—that he was more like a vulture. Papers containing these articles were distributed on the company's premises and no action was taken forbidding it. On October 31 the "Drydocker" contained articles further lampooning French and holding him up to ridicule in doggerel verse as a goose and a vulture. When representatives of the union appeared at the company's gate distributing this issue of the paper, they were ordered off the premises by a guard who stated that the company had forbidden the distribution of union literature on its property. A like incident occurred on December 29 when an attempt was made to distribute at the same place the "Drydocker" of that date which offered a reward to anyone who would submit suitable music for the doggerel verse lampooning French, stating that, when put to music, this would become the union's official theme song.

■ There is no evidence that the company had a rule forbidding the distribution of union literature on its property or that it ever attempted to prohibit distribution on any other occasions. There is no evidence, furthermore, that the union ever attempted to distribute proper literature that it was not allowed to distribute. The statement by the guard in ordering the distributors off the property on October 31 to the effect that the company had forbidden the distribution of union literature is no sufficient evidence of the existence of a rule to that effect. It is sufficient, of course, to establish the act of the company on the occasion in question, but beyond this is mere heresay, and, even as such, does not purport to speak of any rule. For aught that appears, the instructions of the guard may have been confined to the particular literature which the union attempted to distribute on October 31 and December 29. It is not reasonable to give his statement the effect of establishing a general rule or policy, in view of the fact that the company had made no objection to distribution of union literature on its premises prior to that time and has made none since. If the union had offered to distribute literature containing no insulting and defamatory matter and had been forbidden to do so, an inference might well be drawn of the existence of a general rule or policy forbidding the distribution of union literature; but there is no evidence of that sort.

■ Upon these facts, the question before us is whether the company may be held guilty of an unfair labor practice because it has forbidden the distribution on its premises of scurrilous and defamatory literature, which holds its officers and supervising officials up to ridicule and contempt, and which has a necessary tendency to disrupt discipline in the plant. We think that this question must be answered in the negative. The company must maintain order and discipline in its plant; and we see no reason why it may not forbid the circulation on its premises of defamatory and insulting statements which reasonably tend to destroy such discipline, for it is well settled that the employer is not to be held guilty of an unfair labor practice because of action reasonably taken to protect his property or preserve discipline against the unlawful conduct of employees. Thus in N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 257-258, 59 S.Ct. 490, 497, 83 L.Ed. 627, 123 A.L.R. 599, dealing with the discharge of employees engaged in a sit down strike, the court said: "There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights. Elections may be

ordered to decide what representatives are desired by the majority of employees in appropriate units as determined by the Board. To secure the prevention of unfair labor practices by employers, complaints may be filed and heard and orders made. The affirmative action that is authorized is to make these remedies effective in the redress of employees' rights, to assure them self-organization and freedom in representation, *not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct.* We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts which the Board finds to have been committed in this instance would not only not effectuate any policy of the Act but would directly tend to make abortive its plan for peaceable procedure." (Italics supplied)

■ This court has repeatedly held it not to be an unfair labor practice to discharge employees who have been guilty of violence or of unlawful interference with company property. Standard Lime & Stone Co. v. N.L.R.B., 4 Cir., 97 F.2d 531, 535-536; N.L.R.B. v. Clinchfield Coal Corp., 4 Cir., 145 F.2d 66, 155 A.L.R. 874; Home Beneficial Life Ins. Co. v. N.L.R.B., 4 Cir., 159 F.2d 280; N.L.R.B. v. Kelco Corporation, 4 Cir., 178 F.2d 578, 581. In the case last cited, we emphasized that the right of discharge exists because of the disruptive effect which the presence of such employees would have upon the employer's business, even though they may not have been convicted of crime, saying in this connection: "It is not the fact that employees have been convicted of crime that renders them ineligible for reinstatement, but the fact that they have been guilty of unlawful conduct which would make their presence undesirable because of the disruptive effect which it would have upon the employer's business. To order the reinstatement of employees who have been guilty of such serious acts of violence, whether followed by criminal convictions or not, cannot reasonably be said to be proper action to 'effectuate the policies of this act' within the meaning of Sec. 10(c), 29 USCA § 160(c)."

Very much in point is our decision in Joanna Cotton Mills v. N.L.R.B., 4 Cir., 176 F.2d 749, 753, wherein we held that an employer was not to be held guilty of an unfair labor practice for discharging an employee who had adopted a defiant and insulting attitude towards his foreman and had circulated a petition asking for his discharge. We said in that case: "The conduct of Blakely in adopting a defiant and insulting attitude towards Lewis and then circulating a petition for his discharge because Lewis had rebuked him was conduct calling for discharge if any order or discipline in the plant was to be maintained; and the employer should not be branded with the guilt of an unfair labor practice and required to reemploy, with back pay, this defiant and insulting employee merely because it has done what any other employer would reasonably have done under the circumstances. We must not forget that the National Labor Relations Act 'does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them'; that the employer 'may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.' "

If it is not unfair labor practice to discharge an employee for exhibiting a defiant and insulting attitude towards his foreman, a fortiori it is not an unfair practice to forbid the distribution on company property of literature which is insulting and defiant and which scurrilously lampoons the officers of the company and its supervising employees.

Very much in point also, is the decision of the Seventh Circuit Court of Appeals in N.L.R.B. v. Aintree Corp., 7 Cir., 135 F.2d 395, 397, where the court refused to enforce an order of the Labor Board finding a company guilty of an unfair labor practice because it had disciplined employees for distributing circulars thought to be disruptive of discipline. The court said:

"Upon this record, which is undisputed, we conclude that the company was justified in disciplining these two employees. We can hardly believe that this leaflet which tauntingly twitted the employer and the members of the Better Union by calling theirs, the 'company union' voiced an innocent factual inquiry. The two sentences 'Under the Law What Will the Company Have to Do? How Will It Affect the Company Union?' were troublemakers. Calling the Better Union a 'company union' made its members see red. It was adding insult to a defeat which was fresh and hurting. It was certain to arouse heated animosities in the breasts of its members. This, we think, was the purpose of the leaflet.

"Regardless of whether the company had ever given previous notice about the distribution of circulars, those who provoked this feeling were subject to discipline. Two weeks of suspension of employment followed by reinstatement was a temperate judgment and it furnished no basis or justification for the findings and the order of the Board here in controversy."

See also on this point, Howard Foundry Co., 59 N.L.R.B. 60, 72; Thompson Products Co., 57 N.L.R.B. 925, 970, note 44.

The trial examiner, whose report was adopted by the Board, found that the natural tendency of the circulation of the literature was to disrupt discipline, saying in this connection: "In the present case, the natural assumption and expectancy might well have been that the intemperate and invidious nature of some of the published statements would have injuriously affected respondent's ability to preserve discipline. Certainly, the maligning of the supervisors and the holding of the managing officers up to continual ridicule would seem normally calculated to have such an effect." Notwithstanding this finding, it was held an unfair labor practice to forbid the distribution of literature, "normally calculated" to injuriously affect the com-

pany's ability to preserve discipline, merely because no evidence was offered that discipline and efficiency were in fact affected by it. This, we think, was manifest error. The right of the company to prohibit the distribution of insulting and defamatory literature must necessarily depend upon the character of the literature itself and the effect which it might normally be expected to produce, not upon ex post facto proof of the results which actually flowed from its distribution.

The trial examiner held the company at fault because it took action "without warning or prior consultation with the union" and because it did not acquaint the union with the nature of its objections or request it to print corrections or retractions. There was certainly no duty resting on the company, however, to warn or consult with the union as a prerequisite to forbidding the distribution on company property of the insulting and defamatory literature which the union was then attempting to circulate among the employees* see N.L.R.B. v. Aintree Corporation, supra; and as heretofore stated, there is no evidence that the company has ever forbidden or attempted to interfere with the distribution of any proper literature.

■■ Counsel for the Board argue that the action of the company was an abridgement of the freedom of speech guaranteed by the act; but we regard this contention as so utterly lacking in merit as hardly to warrant consideration. Freedom of speech nowhere means freedom to publish libelous and defamatory matter and nowhere does it mean freedom to wantonly lampoon or insult anyone. The employer may not refuse to bargain with his employees nor may he refuse them the reasonable use of his premises for matters connected with union organization and collective bargaining, N.L.R.B. v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638; Republic Aviation Corp. v. N.L.R.B., 324

---

* That the union knew that the company had knowledge of and objected to the sort of literature it was circulating sufficiently appears from a statement in the December 29 issue of the "Drydocker" to the effect that the officials of the company would never be able to tell the union what it could print in that paper.

542

U.S. 793, 65 S.Ct. 982, 89 L.Ed. 557, 157 A.L.R. 1081; but there is nothing in law or in reason which requires him to allow the distribution on his premises of defamatory statements insulting to those who have charge of his business, destructive of discipline and having no reasonable connection with any proper union activity. Counsel for the Board argue that the employer should not be permitted a censorship over the literature of the union; but no censorship is involved in holding that the employer may forbid the distribution on his premises of statements which are defamatory and insulting and which tend to disrupt discipline. In forbidding the distribution of literature by the union, the employer, of course, acts at his peril, and he need not expect to be sustained in squeamish objections to proper criticisms appearing in such literature; but this is not to say that he must supinely permit his premises to be used for spreading insult and defamation against his supervisory employees.

The right of the union to distribute proper union literature on the company's premises is well settled. Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081. The trouble here is that the Board has proceeded upon an erroneous theory of law in holding that, because no actual disruption of discipline is shown, the company may not forbid the distribution of literature the reasonable tendency of which is to cause its disruption. If the company should refuse to permit the union to distribute proper literature on the premises, the Board unquestionably has the power, upon a finding to that effect, to issue a cease and desist order and protect the right of the union to do so; but that is not the sort of case with which we are dealing. To allow the finding of an unfair labor practice to stand against the company under the circumstances here would be to give the sanction of the law to the indecent and insulting conduct to which the officials of the company were subjected and deny to the company the right to forbid on its premises conduct which is manifestly destructive of discipline.

For the reasons stated, the order of the Board will be set aside.

Order set aside.