**NATIONAL LABOR RELATIONS BOARD**
**v. STOWE SPINNING CO. et al.**

**No. 5640.**

Circuit Court of Appeals, Fourth Circuit.

Dec. 22, 1947.

———◆———

Mozart G. Ratner, Principal Atty., N. L. R. B., of Washington, D.C. (Robert N. Denham, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Dominick L. Manoli, Frederick D. Vincent, Jr., and Ida Klaus, Attorneys, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

P. C. Whitlock, of Charlotte, N. C. (Whitlock, Dockery & Moore, of Charlotte, N. C., George B. Mason, of Gastonia, N. C., Harley B. Gaston, of Belmont, N. C., and L. B. Hollowell, of Gastonia, N. C., on the brief), for respondents.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The National Labor Relations Board has petitioned for enforcement of an order issued by it and directed in part to the respondent Stowe Spinning Company, and in part to the respondents Acme Spinning Company, Perfection Spinning Company and Linford Mills, Inc., jointly. After conventional proceedings the Board concluded that all the respondents had violated Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. by interfering with, restraining and coercing their employees in the exercise of rights guaranteed by Section 7 of the Act; and that respondent Stowe had also violated Section 8(3) of the Act by discharging four employees on account of their union membership or activity. The respondents oppose enforcement on the ground that the Board's findings of fact are not supported by sustantial evidence, that its conclusions of law are erroneous, and, on the further ground, that the Board's order in certain respects deprives them of rights secured by the Constitution of the United States. The most important issue in this case is whether the Board may compel the respondents to allow labor unions the use of a hall or auditorium in a building of respondents for the purposes of organization and collective bargaining.

Each of the four respondents operates a cotton mill in North Belmont, North Carolina. Most of the corporate officers of each respondent also hold offices in the others. North Belmont is an unincorporated village approximately two and a half miles north of the town of Belmont. It is largely, if not entirely, devoted to the business operations of the respondents and is, in fact, a company town. Each respondent owns a substantial number of houses in North Belmont which it rents to its employees and their families. These houses comprise the so-called mill villages, which in turn comprise North Belmont.

There are only three buildings in North Belmont of a more or less public nature, a public school house, owned by the state, a motion picture theatre, and a two-story building owned by the respondents jointly to which we must direct particular attention. The first floor is occupied by the United States Post Office and a grocery store. The second floor consists of a hall or auditorium, seating approximately 200 persons, and adapted to use for public meetings or other assemblies.

When this building was erected in 1937 the hall was added primarily to provide a meeting place for Patriotic Order Sons of America, a patriotic organization whose local chapter is composed largely, although not exclusively, of employees of the respondents. Since 1937 the hall has been regularly used by the Order for its weekly meetings and other business. On occasion the hall has been used for other purposes, such as church banquets, Ladies Aid Society meetings, a Christmas party for school children, and for several weeks a safety school for employees of the respondents was conducted there.

Some time in December, 1944, two representatives of the Textile Workers Union, C.I.O., came to North Belmont to investigate the possibility of organizing the employees of Stowe. They induced several employees to solicit the workers to join the union. In January, 1945, Robert Harris, a national representative of the union, came to North Belmont to arrange a mass meeting of the employees of Stowe. He requested Baxter Black, the president of the Order and an employee of Acme, to permit the union to use the hall for a meeting on the following Sunday and Black consented. Later, when knowledge of this event reached DeLambert P. Stowe, an officer of Acme and Perfection, and the agent of all the respondents charged with the management of the hall and the Post Office building, the permission was withdrawn. Harris then attempted, without success, to secure permission to hold the meeting either in the school or in the motion picture

theatre. Ultimately the meeting was held on the street outside the Post Office building.

It is not immediately apparent from this recital of the facts that the refusal of the owners of the hall to allow the union to use it for a meeting of the employees of Stowe constituted a violation of the statute. The majority of the Board, however, reached its conclusion in the following manner. It made the finding that the owner's refusal "to permit use of the hall for purposes of self organization in a labor union under the circumstances constituted unlawful disparity of treatment and discrimination against the Union." It pointed out that foremost among the methods universally utilized by employees in self organization is the exercise of the constitutional right of peaceable assembly. It held that the sole purpose of the respondents' action was to impede, prevent and discourage the employees in the exercise of this basic right and that by refusing the union permission to use the only available meeting place in the community, the respondents in fact deprived the employees of Stowe of the right. Following this line of reasoning the Board stated its formal conclusion of law that by interfering with, restraining and coercing their employees in the exercise of the rights guaranteed in Section 7 of the Act, the respondents engaged in unfair labor practices within the meaning of Section 8(1) of the Act.

■ We are unable to agree with this conclusion. There is no general provision of the Act which requires an employer to treat a labor union in the same manner as it treats other persons or organizations which are not concerned with the interests or activities of labor. Section 8(3) of the Act makes it an unfair labor practice for an employer to encourage or discourage membership in a labor organization by discrimination in regard to hire or tenure of employment or any term or condition of employment; and Section 8(4) makes it an unfair labor practice for an employer to discharge or discriminate against an employee who files charges or gives testimony in cases arising under the Act. Furthermore, acts of discrimination on the part of an employer by which one labor organization or one employee is favored over another or discriminated against in the free exercise of rights under the statute may amount to unfair labor practices and violations of the Act. None of these practices, however, are involved in the use or non-use of the assembly hall.

■ It is equally clear that in the matter now before us the employer has not interfered with, restrained or coerced its employees in the exercise of their rights. Even though it was evident to the workers that the action of the owners of the hall was inspired by hostility to the union, the refusal did not amount to unlawful interference, restraint or coercion. An employer may express his views on labor policies or problems and take any side he chooses in a labor controversy provided that his conduct does not amount to coercion; National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; and if an employer may exercise this freedom without violating the Act, he may surely decline to perform an affirmative act which will encourage and assist a union in its organizational efforts. Indeed the statute contemplates that an employer shall abstain not only from restraint or coercion, but also from all interference with its employees by preserving the strictest neutrality when they are engaged in any activities for or against the formation of a bargaining unit, and the cases so hold. See N. L. R. B. v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9; N. L. R. B. v. Security Warehouse & Cold Storage Co., 9 Cir., 136 F.2d 829; N. L. R. B. v. Faultless Caster Corporation, 7 Cir., 135 F.2d 559; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179; N. L. R. B. v. Cleveland-Cliffs Iron Co., 6 Cir., 133 F.2d 295. The Act seeks to guarantee employees complete freedom of choice in the selection of a bargaining representative; and it is an unfair labor practice for an employer to encourage or discourage his employees to join a bona fide union although it be the only labor organization on the scene. N. L. R. B. v. American Car & Foundry Co., 7 Cir., 161 F.2d 501.

■ The statute makes it very clear that the employer must not encourage or assist

workmen in these activities. Section 8(2) declares that it is an unfair labor practice for an employer to contribute financial or other support to any labor organization; and so it appears that if the owners had freely given the use of the hall to the union as it had been given in the past to the patriotic order and to other social gatherings, it might well have been argued that an infraction of the statute had occurred. It was because of considerations of this sort that the dissenting member of the Board refused to join in its decision. Pointing out that the Board for years has construed the statute as forbidding the most minute kind of financial support to labor organizations, he said:

"* * * It has frowned, for example, upon letting a union organization have the profits from vending machines, even though patronized exclusively by members of the bargaining unit;[31] on the use of company office machines for preparing pamphlets;[32] the use of vacant office space for the transaction of union business;[33] and mere permission to hold union meetings on factory premises.[34] Indeed, this principle has been enunciated in so many cases that any employer who consulted counsel would be loath to let a labor organization conduct a meeting in a building owned by him for fear of incurring the risk of being cited for violation of Subsections 8(1) or (2) of the Act.

"Yet, in this case, we are holding it a violation of the Act for a corporation to refuse to permit an affiliated union to use a hall which was built to afford recreational facilities for its employees. It seems to me that such a decision assumes a duty on the part of the employer to give affirmative support to labor organizations—a premise contrary to the specific language in the Act and the converse of the doctrines developed by this Board with respect to employer attitudes toward independent unions."

The position of the Board baldly stated, is that when there is no place of public assembly convenient to the employees except a company building, the employer must turn it over to union organizers for a meeting on demand. The practical effect of such a holding is to require the owner to maintain the building for union purposes whenever it suits the convenience of the union to requisition it, and to that extent to require him to surrender his property rights. There can be no doubt that if such a compulsion were exercised by the Government for its own purposes, there would be a deprivation of property without due process of law, or a taking of private property for public use without just compensation in contravention of the Fifth Amendment to the Federal Constitution; and certainly if the surrender of the property against the will of the owner were compelled by any private person other than a labor union, no one would deny that a deprivation of property without due process of law had occurred.

We are told by the Board, however, that when a labor union demands the use of a meeting place in order to organize the employees, the right of the employer to regulate the use of his own property comes into conflict with the employees' right to receive information to enable them to exercise the right of self organization, and that under the decisions of the Supreme Court,

"[31] Wilson & Co. v. N. L. R. B., 7 Cir., 126 F.2d 114.

"[32] N. L. R. B. v. General Motors Corp., 7 Cir., 116 F.2d 306; Bethlehem Shipbuilding Corp. v. N. L. R. B., 1 Cir., 114 F.2d 930; N. L. R. B. v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138; N. L. R. B. v. Christian Board, 8 Cir., 113 F.2d 678; N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 109 F.2d 128, enf. as mod. 12 N.L.R.B. 886.

"[33] N. L. R. B. v. American Mfg. Co., 2 Cir., 106 F.2d 61, enf. as mod. 5 N.L.R.B. 443, affirming as modified 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988; N. L. R. B. v. Automotive Maintenance Machinery Co., 7 Cir., 116 F.2d 350 (dictum); N. L. R. B. v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867; N. L. R. B. v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138; N. L. R. B. v. Christian Board, footnote 2, supra; N. L. R. B. v. Ed. Friedrich, Inc., 5 Cir., 116 F.2d 888; N. L. R. B. v. Moore-Lowry Flour Mills Co., 10 Cir., 122 F.2d 419, mod. 21 N.L.R.B. 1040; New Idea, Inc. v. N. L. R. B., 7 Cir., 117 F.2d 517.

"[34] See matter of Virginia Electric & Power Company, 44 N.L.R.B. 404, and Matter of Berkshire Knitting Mills, 46 N.L.R.B. 955."

the controversy must be resolved in the employees' favor. The decisions referred to relate to activities of persons in the exercise of the right of free speech and free press, and in some instances to efforts on the part of union leaders to gain access to employees in order to obtain their support. Thus in Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313, a municipal ordinance forbidding any person to knock on doors or ring doorbells in order to distribute circulars, as applied to the distribution of notices of a religious meeting, was held to be an unconstitutional denial of the freedom of speech and the press contrary to the First and Fourteenth Amendments; and in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, an ordinance was held to be an unconstitutional infraction of the same freedoms since it forbade the distribution of religious literature on the sidewalks of a company town which, although owned by the company, were freely used by the general public. Again, in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, the court held unconstitutional a Texas statute which required labor organizers to register before soliciting membership in labor unions. The court said, 323 U.S. at page 532, 65 S.Ct. at page 323, 89 L.Ed 430: "That the state has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted. They cannot claim special immunity from regulation. Such regulation however, whether aimed at fraud or other abuses, must not trespass upon the domains set apart for free speech and free assembly. This Court has recognized that 'in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. * * * Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.' Thornhill v. Alabama, 310 U.S. 88, 102, 103, 60 S.Ct. 736, 744, 84 L.Ed. 1093; Senn v. Tile Layers Protective Union, 301 U.S. 468, 478, 57

S.Ct. 857, 862, 81 L.Ed. 1229. The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly."

The right of employees to solicit union membership on their own time in the company's plant or on the company's parking lot used by the employees, notwithstanding company rules to the contrary, was upheld in the companion cases, Republic Aviation Corp. v. N. L. R. B. and N. L. R. B. v. Le Tourneau Co. of Georgia, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081. The court was of opinion that in working out an adjustment in labor cases between the undisputed right of self organization guaranteed to employees under the statute and the equally undisputed right of employers to maintain discipline in their establishments, the privilege of the employees weighed the more heavily; and in considering whether the reasonable inferences to be drawn from the evidence in these cases warranted a finding of unfair labor practices, the court quoted in a footnote, 324 U.S. 793, at page 802, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081, a passage from the decision of the Labor Board in the Le Tourneau case where it was said that a violation of the Fifth Amendment was not necessarily caused by every inconvenience or dislocation of property rights caused by giving access to the company's property to persons whose presence was necessary to enable the employees to exercise the right of organization and of collective bargaining. To the same effect is the decision in N. L. R. B. v. Cities Service Oil Co., 2 Cir., 122 F.2d 149, in which the court sustained the Labor Board in upholding the right of union representatives to visit seamen on board ships where they were employed in order to discuss grievances or investigate conditions. See also South Atlantic S. S. Co. v. N. L. R. B., 5 Cir., 116 F.2d 480.

This review of the decisions relating to the respective constitutional rights of employer and employees carries the recent development of the law in this field as far as it has gone, and it seems obvious that it has not gone and cannot go to the extent of upholding the decision of the Board

in the pending case. The conflict in the fundamental rights of the parties to labor disputes which have been described had little relation to the employer's property and caused little or no interference with its devotion to the purposes of the owner. The premises of the employer were necessarily occupied by the whole group of employees assembled to operate the business, and communication between them on labor matters did not interfere substantially with the business of the employer, or inconvenience him at all when, as in the Le Tourneau case, it was limited to the employees themselves and was done on their own free time. Even in the cases where union representatives were admitted to ships, because there alone were the seamen conveniently accessible, there was no substantial interference with the business or the property of the owner.

In the pending case, there was no evidence of any interference with or restriction upon the men in their communications on labor matters either with each other or with the agents of the union, in the homes of the men or on the streets of the town, or for that matter in the company's plant itself; and we think that the Board had no authority to compel the companies to surrender their other property against their will for uses of which they did not approve, since the Board's power in this direction is limited by a constitutional provision of great importance under our form of government.

■ We must now consider the additional holding of the Board that the respondent Stowe committed other unfair labor practices in violation of Section 8(3) of the Act by discriminatorily discharging four employees, George W. Gainey, Mabel Gainey, Emma Louise Gainey, and John R. Hall.

The evidence bearing on the discharge of the Gaineys may be summarized as follows: George Gainey, his wife Mabel, his daughter Emma Louise, and his son Alfred were employed by Stowe and rented a house from it in the mill village. George Gainey, as a supporter of the union, was active and successful in soliciting membership

for it; and these facts were known to his employer. On February 24, 1945, McCarn, an overseer of the company, discharged a boy for not doing his work properly. Alfred Gainey, George Gainey's son, quit his job in protest. McCarn thereupon ordered the discharge of all the members of the Gainey family as they reported for work and compelled them to give up their house.

The respondent Stowe offered testimony to show that it was the policy of the company to discharge an entire family living in a company house when one member quit so as to procure the house for other employees. It pointed out that Alfred Gainey was a doffer, that there was a shortage of doffers at that time, and that it was necessary to evict the Gaineys in order that the house might be given to another doffer and his family. It was testified that McCarn tried to persuade Alfred Gainey not to quit and it is argued that this would not have been done had it been the intention of the respondent to get rid of the Gainey family. Finally there is evidence that Gainey, after his discharge, was employed by Linford, and in view of the close interrelationship between the respondents, it may be thought that this would not have been done had there been a discriminatory motive for the discharge.

On the other hand, there was no evidence that the company policy, as applied to the Gaineys, had ever been invoked before, and there is evidence that in one instance an entire family in a company-owned house was not discharged although one member quit. Furthermore, no doffer had applied for work or was awaiting employment at the time of the discharge. The Board pointed out that even if it was necessary to compel the Gaineys to vacate the house, it was not necessary also to discharge them inasmuch as residence in a company-owned house was not a condition precedent to employment. The Board was thus of the opinion that, in the light of the respondent's hostility to the union, the absence of any complaint as to the quality of the Gaineys' work, the fact that Gainey was an active union organizer, and the weakness of the reason assigned for the discharges, the real motive for the company's

conduct was hostility to the union. We think that there was substantial evidence from which the Board's conclusions might reasonably be inferred, and, accordingly, we shall enforce its order in this respect.

■ With respect to the discharge of John Hall on February 10, 1945, the record discloses the following facts: Hall was hired by the respondent Stowe in October of 1944. He worked on the second shift as a doffer and shortly after his employment was also assigned to the first shift as the head doffer, and thereafter continued to work on both the first and second shifts until the day of his discharge. On that day he arrived for work on the first shift at 6:45 A. M. and about a half an hour later he left and went home for breakfast. He had been in the habit of doing this and no objection had heretofore been made. He returned to work about three quarters of an hour later. Upon his return he was reprimanded by Childers, the second hand, and told that he would have to stay on the job in order to perform certain operations which, although not strictly part of his job as head doffer, he had been in the habit of performing. A few minutes later, McCarn, the overseer, reiterated the reprimand. Hall then lost his temper and said that before he would do the work he would quit. McCarn replied "all right" whereupon Hall said he would not quit and that McCarn would have to fire him. McCarn, however, took the position that Hall had quit and refused to consider the matter any more, and told Hall to vacate his house. Hall thereafter visited Kale, the superintendent, in the company of George Gainey in an effort to secure his reinstatement, but he was not successful and ultimately he moved and took employment elsewhere.

The question whether Hall was discharged for union activities, as the Board found, or resigned rather than do the work required of him, is not free from doubt; but we are unable to say that there was no substantial evidence to support the Board's conclusion. He was an active union organizer, and there is some evidence that his conduct in this respect was known to his employer. He was an unusually good worker and the alacrity with which the overseer seized upon his statement that he was quitting, and the subsequent refusal of the superintendent to grant his request for reinstatement, tend to show that the company's position was actuated by something other than his conduct on his last day at the plant.

The Board's order with respect to the respondents, Acme, Perfection and Linford is based entirely upon the denial of the use of the hall and accordingly, we shall deny enforcement of the order in its entirety as to these respondents. The order with respect to respondent Stowe will be modified by deleting therefrom the provisions with respect to the use of the hall, i. e., paragraphs 1(b) and 2(c) of the order, and the third paragraph of the notice which the respondent Stowe is required to post.

As modified, the order of the Board will be enforced.