### SALT RIVER VALLEY WATER USERS' ASS'N v. NATIONAL LABOR RELATIONS BOARD.

#### No. 13456.

United States Court of Appeals, Ninth Circuit.

July 23, 1953.

Jennings, Strouss, Salmon & Trask, Irving A. Jennings, Richard G. Kleindienst, Phoenix, Ariz., for petitioner.

George J. Bott, Gen. Counsel, NLRB, David P. Findling, Assoc. Gen. Counsel, NLRB, A. Norman Somers, Asst. Gen. Counsel, NLRB, Dominick L. Manoli, Thomas F. Maher, Attys., NLRB, Washington, D. C., Charles Hackler, Atty., NLRB, Los Angeles, Cal., for respondent.

Before MATHEWS, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

The Salt River Valley Water Users' Association, hereafter the Association, petitions to review and set aside an order of the National Labor Relations Board, hereafter the Board, which requires the Association to cease and desist from certain unfair labor practices and to take certain affirmative action. The Board's order is based upon findings that employee Leo Sturdivant was discharged in violation of § 8(a)(1) of the Labor Management Relations Act of 1947, hereafter the Act, 29 U.S.C.A. § 158(a) (1), for engaging in activities protected by § 7 of the Act, 29 U.S.C.A. § 157, and that remarks made by a supervisory official of the Association violated § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), since they were an interference with employee H. C. Selliez's protected rights.

The first question presented is whether the Association is engaged in activities affecting commerce within the meaning of the Act.

The Association, an Arizona corporation, conducts the operations of a federal reclamation project called the Salt River Project. In this capacity the Association maintains an irrigation system for the 242,000 acres of the Salt River Valley, 213,000 acres of which are under irrigation. Each landholder living within the geographical boundaries of the Project is entitled to one share of stock in the Association for each acre of land he owns. These irrigated farm lands have become the center of a vast agricultural industry. The irrigation facilities maintained by the Association are valued in excess of $16,000,000.

Various statistical reports of the Department of Agriculture were introduced in

evidence to show the impact of the Association's operations upon the flow of interstate commerce. An examination of these exhibits discloses that the Salt River Valley contributes a very significant portion of Arizona's total agricultural production and that a substantial percentage of the Valley's produce is shipped out of the state. These exhibits also show the importance of the Salt River Project to the economic prosperity of the Salt River Valley.[1]

Witness Don Barrett, an official of a company engaged in the packing and shipping of vegetables, testified that of 1500 cars of produce grown on lands within the Project which his company had packed during the last year all but 150 or 175 cars entered interstate commerce. He stated that this roughly represented the percentage of produce packed by his company which went out of the state and stayed in the state through the years. He finally testified from experience that a majority of the vegetables grown in Arizona are shipped out of the state.

The evidence is sufficient to show that the Association furnishes a substantial portion of the Salt River Valley's water for irrigation purposes, and that in turn a substantial portion of the produce grown in the Valley is shipped out of the state. In order to establish that the activities of the Association affect interstate commerce the Board is not required to go to the extent, as the Association contends, of proving the exact percentage of the crops that are grown in the Salt River Valley which are supplied with water by the Association. Although some of the water used in the area may be derived from private pumps, the magnitude of the Association's contribution to the lands from which are shipped

large quantities of produce for interstate transportation establishes the effect of the Association's activities upon interstate commerce.[2]

This Court has held that employees engaged in the irrigation operations of the Association were "engaged in the production of goods" for interstate commerce within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 203 (j). Reynolds v. Salt River Valley Water Users' Ass'n, 9 Cir., 1944, 143 F.2d 863, certiorari denied, 323 U.S. 764, 65 S.Ct. 117, 89 L.Ed. 611. That the activities of the Association "affect" interstate commerce would seem directly to follow. Since the decision in the Reynolds case the Association has ceased generating electrical power, this duty now being performed by the Salt River Project Agricultural Improvement and Power District, nevertheless the generation of electrical power, admittedly sold by the Power District to corporations engaged in interstate commerce, was dependent upon water power sources contributed by the Association and its facilities. Thus, as the Board found, the Association's irrigation operations "play an indispensable part in the interstate power operations."

There is no merit in the Association's contention that it is not engaged in activities affecting commerce because it "buys nothing" and "sells nothing" in interstate commerce. See, for example, Zall v. N.L.R.B., 9 Cir., 1953, 202 F.2d 499, where an employer produced chicken feed which was sold to purchasers who fed it to breeding stock whose hatching eggs were later sent out of the state. Cf. McComb v. Super-A Fertilizer Works, Inc., 1 Cir., 1948, 165 F.2d 824 (Fair Labor Standards Act), where an employer made fertilizer

1. For example 13,500 acres of Salt River Valley land was used for production of the spring crop of lettuce in 1950 and the total yield was 2,051,916 crates. Of this total yield 1,526,384 crates came from 10,042 acres of land within the area serviced by the Association.

2. The Association well recognizes its own economic significance. Thus, the following statements appeared in its 1950 Biennial Report to the shareholders:

"The importance of the Water Users' Association cannot be over-emphasized. It affects the daily life of everyone in Arizona. * * *

"This agricultural empire created by the Reclamation Act of 1902 [43 U.S.C.A. § 372 et seq.] is the basic industry for the entire state of Arizona. Every city in the state, every citizen, every school district, every individual enterprise is dependent upon the continuing prosperity of the irrigated farm lands."

which was sold to farmers who raised sugarcane, which was in turn sold to sugar mills to be processed into sugar and molasses, which was then shipped in commerce.

■■■■ The Board found that the Association violated § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), by discharging Leo Sturdivant, who was employed by the Association as a zanjero.

This Court has previously considered the nature of a zanjero's duties in Reynolds v. Salt River Valley Water Users' Ass'n, supra. It will suffice for our purposes to note that the zanjeros are responsible for the delivery of water to the Association's shareholders upon daily instructions. The unusual nature of their work which includes the actual measuring and routing of the water from the canals maintained by the Association through the various intermediate ditches and laterals to the point of delivery requires the zanjeros to be on duty 24 hours a day, seven days a week. The actual performance of their work, however, is intermittent rather than continuous, and it does not appear that other activities were prohibited when they did not interfere with the carrying out of the zanjeros' duties.

The peculiar nature of the zanjeros' duties and working hours has resulted in considerable dispute as to their wages and the adequacy thereof under the minimum wage provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. This matter had been discussed at meetings of the union to which the zanjeros belonged, but some of the zanjeros were dissatisfied with the progress the union had made. Therefore, in October of 1950, a group of zanjeros attended a meeting at which Sturdivant was selected to circulate a petition conferring upon him power of attorney to recover for the zanjeros by court action or negotiation their individual claims for backpay and overtime wages allegedly due from the Association under the provisions of the Fair Labor Standards Act. In less than two weeks Sturdivant obtained the signatures of 30 or 35 zanjeros on his petition. The Association discharged him on November 7, his discharge slip stating merely that he was "an unsatisfactory employee."

The Board asserts that circulation by Sturdivant of the petition authorizing him to take action on behalf of the zanjeros in regard to their grievances constituted "concerted activities for the purpose of * * mutual aid or protection" within the meaning of § 7 of the Act, 29 U.S.C.A. § 157. We agree with this contention. The Act provides that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative * * *." § 9 (a) of the Act, 29 U.S.C.A. § 159(a). Concerted activity may take place where one person is seeking to induce action from a group. N.L.R.B. v. Schwartz, 5 Cir., 1945, 146 F.2d 773. Further, "concerted activities for the purpose of * * * mutual aid or protection" are not limited to union activities. Modern Motors, Inc., v. N.L.R.B., 8 Cir., 1952, 198 F.2d 925; N.L.R.B. v. J. I. Case Co., 8 Cir., 1952, 198 F.2d 919; N.L.R.B. v. Phoenix Mut. Life Ins. Co., 7 Cir., 1948, 167 F.2d 983, 6 A.L.R. 2d 408, certiorari denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395. By soliciting signatures to the petition, Sturdivant was seeking to obtain such solidarity among the zanjeros as would enable the exertion of group pressure upon the Association in regard to possible negotiation and settlement of the zanjeros' claims. If suit were filed, such solidarity might enable more effective financing of the expenses involved. Thus, in a real sense, circulation of the petition was for the purpose of "mutual aid or protection." The Association argues that any legal rights to backpay on the part of the zanjeros were individual rights and that therefore there could be no "mutual" aid or protection. But the Association ignores the fact that "concerted activity for the purpose of * * * mutual aid or protection" is often an effective weapon for obtaining that to which the participants, as individuals, are already "legally" entitled.

The Association finally contends that even if Sturdivant's circulation of the peti-

tion was a protected activity under the Act he was discharged because of the "disturbance" this activity was creating. Thus, McMullin, the Association's General Manager, testified that he had received reports that the zanjeros were being "disturbed in their work" and that there was a "possibility of a general lowering of efficiency throughout the system." It is obvious that concerted activities which are protected by the Act often create a disturbance in the sense that they create dissatisfaction with the status quo. Such a fact without more can hardly justify discharge. The Board found that there was no evidence in the record to show that the work of any of the zanjeros suffered by neglect because of Sturdivant's activities. In the absence of such a showing the discharge was not proper. That the Association may have acted in good faith, believing itself justified in discharging Sturdivant, is not material where the activity for which he was discharged was actually protected by the Act. Cusano v. N.L.R.B., 3 Cir., 1951, 190 F.2d 898.

█ The Board also found that certain remarks made by S. H. Angle, a supervisory watermaster of the Association, to Zanjero H. C. Selliez violated § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1).

The testimony of Selliez, solely relied upon by the Board, indicates that during a telephone conversation for the purpose of Selliez's periodic report Angle informed Selliez that his name appeared on the petition which Sturdivant had been circulating, and, upon Selliez's denial of this fact, Angle said he would have Selliez's name removed from the petition.[3] If this were all that his testimony disclosed, it might be reasonable to infer that these remarks interfered with or restrained Selliez's exercise of rights guaranteed him by the Act. But two other facts disclosed by Selliez's testimony preclude the Board's inference. First, Selliez stated on cross-examination that although he had originally signed the petition he had told another zanjero to take his name off the petition *prior* to the conversation with Angle. Since the decision to remove his name from the petition had been made prior to the conversation with Angle, that conversation could not, in fact, have had a coercive effect upon Selliez. Second, Selliez's own testimony removes the necessity for any speculation as to whether Angle's remarks tended to "interfere with, restrain, or coerce" Selliez's exercise of his guaranteed rights, since he clearly states that he did not construe the remarks as a threat.[4] Under these circumstances we find no substantial evidence on the record considered as a whole to support the Board's finding.

The cause is remanded to the Board for modification of its order in accordance with this opinion, and, as so modified, the order will be enforced.

3. The entire pertinent testimony of Selliez on direct examination is as follows:

"Q. Will you describe in your own words, just as nearly as you can remember, the conversation that took place between you and Mr. Angle?

"A. Well, after I had turned in my report, Mr. Angle said, 'I see you are on the Water Users' suit,' and I told him I wasn't. And he says, 'Oh, yes, you are.'

"I says, 'How do you know?'

"He says, 'Well, I see your name on the petition,' and I argued with him about it.

"And he said, 'Well,' he says, 'I will be going in tomorrow or the next day and I will have your name taken off.'

"I told him, 'Well, you don't need to bother about it, because it isn't on there.'

"And as far as I know, that is as far as it went. That was about all that was said, as far as I know. That was all that was said, because I never talked any more about it."

4. Selliez testified on recross examination as follows:

"Q. Did you gather from Mr. Angle's remarks because he was your supervisor he would take any action with respect to your condition of employment in the future if you didn't take your name off? A. No.

"Q. Were you in any way told—did you construe any of those remarks to be a threat if you didn't take your name off? A. Oh, no, definitely not."