NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

KNICKERBOCKER PLASTIC COMPANY, Inc., Respondent.

No. 14029.

United States Court of Appeals, Ninth Circuit.

Jan. 15, 1955.

---

George J. Bott, General Counsel, David P. Findling, Associate General Counsel,. Marcel Mallet-Prevost, Asst. General Counsel, Elizabeth W. Weston, Nancy M. Sherman, Attorneys, N.L.R.B., Washington, D. C., Daniel J. Harrington, Attorney, N.L.R.B., Los Angeles, Cal., for petitioner.

Mitchell, Silberberg & Knupp, Arthur Groman, Charles Lawrence Swezey, Los Angeles, Cal., for respondent.

Before STEPHENS and FEE, Circuit. Judges, and LING, District Judge.

STEPHENS, Circuit Judge.

The National Labor Relations Board is. here petitioning for our order ordering the enforcement of the board's order

against respondent, Knickerbocker. The board found that respondent had discharged two of its employees, Mary Ann Goff and Blanche Rounsavell, because of their testimony at a prior board hearing in violation of § 8(a) (3) (4) and (1) of the Labor Management Relations Act of 1947,[1] cited in complaint as the National Labor Relations Act, as amended, Public Law 101, 80th Congress, First Session. The Board also found that respondent had refused to bargain with International Association of Machinists, hereinafter referred to as IAM, which represented a majority of its employees, in violation of § 8(a) (5) and (1);[2] discharged a number of employees because they went on strike in protest against the discriminatory discharges and refusal to bargain, in violation of § 8(a) (3) and (1);[2] accorded exclusive recognition and bargaining rights to Playthings, Jewelry & Novelty Workers International Union, CIO, and its Local 801, in the face of the IAM's prior claim for recognition, in violation of § 8(a) (2) and (1);[2] and made a union-security agreement with the Novelty Workers at a time when the statutory preconditions to such an agreement had not been fulfilled, thereby additionally violating § 8(a) (1) (2) and (3) of the Act.[3]

1. Title 29 U.S.C.A. § 151 et seq., as amended, June 23, 1947, 3:17 P.M., E.D.T., c. 120, Title 1, § 101, 61 Stat. 136 et seq. In pertinent part the Act provides as follows, Title 29 U.S.C.A. § 158:

"§ 158. Unfair labor practices

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other to support it; Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 158(a) of this title as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) if, following the most recent election held as provided in section 159(e) of this title the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (a) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title." As amended June 23, 1947, 3:17 p. m., E.D.T., c. 120, Title I, § 101, 61 Stat. 140, and compare statute as amended Oct. 22, 1951, c. 534, § 1(b), 65 Stat. 601.

2. See footnote 1, supra.

3. It is stated in the decision and order of the National Labor Relations Board as follows:

"The Board has reviewed the rulings made by the Trial Examiner and finds that no prejudicial error was committed. The rulings are hereby affirmed. The Board has considered the Intermediate Report, the exceptions and briefs, and the entire record in the case, and hereby adopts the findings, conclusions and recommendations

## The Discharges.

Mary Ann Goff began her employment with respondent in January of 1948. The testimony indicates that due to a rare combination of intelligence and ability, she was one of respondent's best workers and in fact had on two or three occasions refused proffered promotions to management level. At a prior board hearing she gave testimony adverse to respondent which resulted in the board declaring a representative election ineffective. When the IAM attempted to organize respondent's plant, she actively aided the effort. Subsequently, she was directed to work on jet gun repair. She protested on the ground that she could not physically stand that particular work. The foreman asked her to sign a statement to that effect which she refused to do but she did say that she would explain to the "office". She worked that day at the job. That evening she asked for and received a leave of absence for the purpose of caring for her sick sister. In about two weeks she returned to work and resumed her former duties making cylinders for squirt guns. Shortly after her return she was requested to return to the jet gun repair job. She again refused on the ground of health. After some conversation with Mr. Hersey, respondent's vice president, she was discharged on the ground that she had refused the job.

The evidence indicates that Goff was qualified and competent on every operation respondent had, and that there was plenty of other work to which she could have been assigned. Further, there was uncontradicted testimony to the effect that other girls had refused job transfers and were not disciplined for the refusal.

Blanche Rounsavell had worked for respondent for over four years. In June of 1951, she contracted influenza and was absent from work for a week. Respondent's rules required a girl to notify her foreman when she was going to be absent. As was her custom, Rounsavell notified Schumacher, her floor-lady, of her sickness rather than Smith, her foreman. At the end of the day on which she returned to work she was discharged, the reason given was that she had failed to call in during her absence.

At the board hearing it was additionally claimed that she was discharged for excessive absenteeism; excessive talking and refusing to accept a transfer from the assembly line to the water gun job. Like Goff, Rounsavell had given testimony adverse to respondent in the former hearing and was active in the attempted organization of respondent's plant by IAM.

■■ It is of course generally within the right of management to assign qualified employees to the particular work it desires them to perform. However, in this instance, the evidence taken as a whole is sufficient to support the conclusion of the board that the reasons given by the respondent for the discharges were merely attempts to create a plausible excuse to discharge Goff and Rounsavell for their IAM activities, and unfavorable testimony at the prior hearing.

of the Trial Examiner, with the additions and modifications noted below."
The additions were as follows:
"In addition to the Trial Examiner's finding that the Respondent on several grounds violated Section 8(a) (2) of the Act by entering into a union security agreement with the CIO, we find that such conduct also constitutes independent violations of Section 8(a) (1) and 8(a) (3). Ferro-Co-Corporation, 102 NLRB No. 167; John B. Shriver Company, 103 No. 2. As the contract between the Respondent and the CIO was illegal because of the latter's failure to achieve compliance with Section 9(f), (g), and (h) of the Act, we do not find it necessary to pass upon or to adopt the Trial Examiner's dictum that the contract, despite its maintenance of membership clause, otherwise 'contained legal union security language.' "
The Board also corrected an obvious confusion of names in the Trial Examiner's report as to the July payroll.

### The Majority.

One of the most controversial points in the case is the finding of the board that the IAM was in fact the choice of a majority of the employees as their bargaining representative.

The campaign of the IAM to organize respondent's plant had its inception in mid-1950 and IAM filed a petition for certification of representatives in June of that year. Respondent agreed to a consent election which was held on September 6th and 7th, 1950, in which IAM narrowly was defeated by a vote of 81 to 86. This election was set aside by the board because of unfair labor practices on the part of respondent. (Knickerbocker Plastic, 96 NLRB 586.) Following this action by the board, IAM continued its campaign to secure recognition as the employees' bargaining representative. During this period organizing drives were also being conducted in respondent's plant by Playthings, Jewelry and Novelty Workers International Union, CIO, and by the United Rubber, Cork, Linoleum and Plastic Workers of America. On March 20, 1951, the IAM organizer informed President White of respondent in writing that a majority of the employees wished his organization to represent them and requested recognition of IAM as the bargaining agent. This request went unanswered by respondent and was repeated by letter of May 15, 1951. Again no reply was received from respondent. In June, Goff and Rounsavell were discharged and on July 5 a meeting was called at which by unanimous consent a committee was nominated and empowered to call a strike. There is evidence that the IAM president telephoned President White of Knickerbocker expressing concern over the impending strike and stating that he was willing to submit evidence showing IAM had a majority of cards signed by employees designating IAM as bargaining agent and in reliance thereon he again requested recognition of IAM. President White refused a requested conference and referred him to respondent's attorney. The strike was called for July 9, 1951, and continued until March 24, 1952, at which time IAM organizer Gordon on behalf of all the striking employees unconditionally offered to return the strikers to work.

In September, 1951, while the IAM strike was in progress, the Playthings Workers intensified their organizing efforts and contacted President White of respondent with a claim of majority representation. Respondent readily agreed to submit to a card check by a disinterested party. The California Conciliation Service conducted a check which showed that a majority of the persons then working in respondent's plant had signed cards favorable to Playthings Workers. As a result of this check, respondent signed a two-year contract with Amalgamated Plastic Toy and Novelty Workers, Local 801, of the Playthings Workers International. Subsequent to the strike date of July 9, the board reviewed the IAM cards and found that the IAM had a majority on July 6, 1951.

We have carefully analyzed the IAM cards in the light of respondent's objections to the use of some of them in the determination of the majority, and we have concluded that there was sufficient showing that the IAM had a majority of the workers in the bargaining unit as shown by the authentic cards, as of July 6, 1951.[4]

### The Refusal to Bargain.

While there is conflicting testimony, we think there is ample evidence to support the board's finding that respondent committed an unfair labor practice by refusing to bargain with IAM. Respondent contends that its refusal to

---

4. The board concludes that there are 318 voting employees in the unit. 159 cards would be the equator and 160 cards would constitute a majority. The Board finds 174 employees designated IAM. There are 247 cards included as exhibits. Considering these exhibits in a light most favorable to the petitioner, there appear to be no less than 160 valid cards which is sufficient for a majority. A painstaking check of the cards will not permit us to conclude that the board's finding of 174 valid cards was clearly erroneous.

so bargain does not constitute an unfair labor practice since it was made in good faith and honest doubt of IAM's majority. In support thereof respondent points to testimony that in 1950 an organizer for Playthings Workers demanded respondent sign a contract with his union in respondent's Glendale plant because the union already was bargaining agent in respondent's New York plant. This organizer represented that failure to sign by respondent would cause the union to petition the board to compel respondent to transfer its entire Glendale operation to New York. Further testimony indicates that in 1951 with three unions actively attempting to organize the plant, the Playthings Workers claimed to have 200 designation cards, the Rubbers Workers 150, and the IAM a majority. Respondent contends in a unit of 318 workers, some or all of such claimed representations were incontrovertibly erroneous. In view of the turbulent status of the organizational campaign and IAM's loss of the consent election of the previous September, respondent claims justification in withholding recognition from IAM, since respondent was in good conscience doubtful as to which, if any, union represented a majority of the workers.

It is well established that an employer is under a duty to deal only with the true representatives of his workers. Virginian Railway Co. v. System Federation No. 40, etc., 1937, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789; N.L.R.B. v. Union Pacific Stages, Inc., 9 Cir., 1938, 99 F.2d 153, 159. Accordingly, it is held that an employer acting in good faith may refuse to negotiate with a union until it can be determined whether the union desiring recognition actually represents a majority of the employees. N.L.R.B. v. Chicago Apparatus Co., 7 Cir., 1941, 116 F.2d 753, 758; Texarkana Bus Co. v. N.L.R.B., 8 Cir., 1941, 119 F. 2d 480, 484. And where two or more unions claim to represent the employees, the employer has a duty not to recognize any of them until one of them proves a majority. Ohio Ferro-Alloys Corp. v. N.L.R.B., 6 Cir., 1954, 213 F.2d 646. However, while an employer normally has the right to insist upon a board ordered election to determine the claimed majority, he may not, in bad faith, refuse to recognize the union in order to gain time in which to undermine the union or dissipate the claimed majority. Mount Hope Finishing Co. v. N.L.R.B., 4 Cir., 1954, 211 F.2d 365, 373; N.L.R.B. v. Epstein, 3 Cir., 1953, 203 F.2d 482; N.L.R.B. v. Jackson Press, Inc., 7 Cir., 1953, 201 F.2d 541, 544; Joy Silk Mills v. N.L.R.B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, 741; North Electric Mfg. Co. v. N.L.R.B., 6 Cir., 1941, 123 F.2d 887, 889; N.L.R.B. v. Empire Furniture Corp., 6 Cir., 1939, 107 F.2d 92, 94 N.L. R.B. v. Remington Rand, Inc., 2 Cir., 1938, 94 F.2d 862.

The board, relying primarily upon the testimony of IAM witnesses, called by General Counsel, found that the conduct of respondent's officers clearly constituted a positive rejection of the entire principle of collective bargaining. The evidence relied on showed that respondent had discharged Goff and Rounsavell for union activities; that President White had shown animosity to IAM and had stated he would never sign a contract with IAM; that he had shown preference to the Playthings Workers; that by July 6, 1951, IAM and the Playthings Workers were the only active contenders; that while the strike was on, President White and Vice President Hersey urged strikers in the picket line to return to work; that on July 10 and 11 respondent sent telegrams to 138 striking employees, announcing that they would be considered as having voluntarily terminated their employment if they did not return to work by July 12; and on July 26 respondent wrote to those persons to whom telegrams had been sent and who had not returned to work, that their hospitalization and medical insurance would automatically terminate on July 31. The ex-

aminer further found that respondent's refusal to bargain with IAM was not caused by any doubt concerning the number of employees who had designated IAM as their bargaining representative, but was a dilatory tactic based upon respondent's attitude that it would not bargain with the IAM under any conditions.

We quote from N.L.R.B. v. Clarksburg Publishing Co., 4 Cir., 1941, 120 F.2d 976, 980: "The evidence indicates and the Board found that the Guild represented a majority of the editorial employees; and it is obvious that the refusal of the company, acting through Highland, to bargain with the Guild was not due to any doubt as to the number of employees in the union, but was due to a positive rejection by the company of the principle of collective bargaining. Where the real attitude of an employer is that he will not bargain collectively with his employees under any conditions, he cannot excuse himself on the ground that sufficient proof of a majority status was not furnished him. [National] Labor [Relations] Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 85 L.Ed. 1540; [National] Labor [Relations] Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22."

We have viewed the record in context as a whole, under the doctrine of Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and have concluded that we should have to weigh the evidence as a fact finding body to hold that respondent did not violate the Act by declining to recognize IAM as the bargaining agent.

### The Union Security Clause.

The contract contained a "union security" clause whereby all respondent's employees on the date of the contract as well as those who became employees thereafter, agreed to maintain for the life of the agreement their membership in the union as a condition of employment. We quote from petitioner's brief, at p. 28:

" * * * Prior to the execution of the contract, neither the International Novelty Workers nor Local 801 had obtained the Board certificate of authority to make a union-shop agreement which was then required by Section 8(a) (3) of the Act, although the International had filed a petition for the necessary union-shop referendum. On October 22, 1951, Section 8(a) (3) of the Act was amended by eliminating the requirements for such a referendum and substituting a requirement that, to validate a union-security agreement, the labor organization must have received from the Board 'at the time the agreement was made or within the preceding 12 months,' a 'notice of compliance' with the filing requirements of Section 9(f), (g), and (h) of the Act. Local 801 did not come into compliance with these requirements until April 2, 1952, more than 6 months after the contract was executed.

"In the Board proceedings, respondent contended that its contract with the Novelty Workers was not unlawful because the clause containing the maintenance-of-membership provision ended with the following language: 'Subject to the pertinent provisions of applicable laws, particularly those set forth in the National Labor Relations Act as amended 1947.' The Board overruled this contention, holding that neither the quoted provision itself nor any other evidence showed that the contracting parties intended to defer the operation of the union-security clause, as distinguished from limiting its application to the comparatively few situations in which Section 8(a) (3) permits discrimination against non-members of a labor organization pursuant to a *valid* union-security contract."

The above quotation is a concise statement as to the point involved and we are in accord with the board's ruling as to the union-security contract. We think the board was supported by the facts and the law when it decided that in its recognition of Local 801 respondent violated § 8(a) (2) and (1) of the Act, and by executing the union security agreement it violated § 8(a) (3).[2] It follows that the employee strikers who were discharged on July 10th and 11th, 1951, shall have the privilege of reinstatement as provided in the board's order.

The petition for enforcement was submitted to us on the 8th day of October, 1954. Testimony was given at the hearing that the average tenure of respondent's employees was brief. The circumstances out of which this case arose took place three and one-half years ago in mid-1951. In all probability the circumstances have materially changed including turnover of employees and possible change of viewpoint on the part of both employer and employees. From all appearances, employees have been amicably represented by Local 801 since September 1950. Although it has been held under similar circumstances not to be within the power *of* this court to order the board to conduct a new election, N.L. R.B. v. P. Lorillard Co., 1941, 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380, when it is considered that the fundamental purpose of the labor Act was and is to prevent disturbance of interstate commerce by labor disputes, through employer-employee agreements arrived at by employer and employees' bargaining agent, it would seem that enforcement of the board's order should be approached with care lest the purposes of the Act be hindered rather than effectuated.

The board's petition for enforcement is granted.