**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**KEARNEY & TRECKER CORPORATION, Respondent.**

**No. 11726.**

United States Court of Appeals
Seventh Circuit.

Oct. 12, 1956.

- Marcel Mallet-Prevost, Asst. Gen. Counsel, Rose Mary Filipowicz, Atty. National Labor Relations Board, Washington, D. C., Theophil C. Kammholz, Gen. Counsel, Fannie M. Boyls, Attys. National Labor Relations Board, Washington, D. C., for petitioner.

Leon B. Lamfrom, Milwaukee, Wis., Helen F. Humphrey, Washington, D. C., Lamfrom & Peck, Milwaukee, Wis., for respondent.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

This cause is before us upon the petition of the Board for enforcement of its order, pursuant to Sec. 10(e) of the Na-

tional Labor Relations Act, as amended, 29 U.S.C.A. § 160(e), in which it found that respondent had, violated Sec. 8(a) (1) of the Act, by interfering with, restraining or coercing employees in the exercise of the right guaranteed by Sec. 7 of the Act, "* * * to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection". The question presented involves the legality of respondent's disciplinary action against seven employees who insisted that respondent explain to them as a group, to their satisfaction, the mechanics of the incentive system. Essentially the problem is whether, under the circumstances existing at the time of the incident, the employees were engaged in protected concerted activities for their mutual aid and protection.

For some years prior to 1951, respondent's employees had been exclusively represented by the Employees Independent Union (hereinafter called EIU). In September, 1950, a schism occurred within that union. A substantial number of the employees remained loyal to the old union. However, a new group, including most of the officers of EIU, joined Local 1083, UAW, CIO (hereinafter called the Local), which, thereafter, filed a representation petition with the Board. After the election called to determine the exclusive bargaining representative, on October 31, 1951, the Local, having received a majority was certified as the exclusive bargaining representative. Nevertheless, respondent, questioning this action, refused to recognize or deal with either EIU or the Local, or any other group, but, in practice, continued to observe the substantive provisions of its unexpired contract with EIU as far as possible. Subsequently a complaint was filed by the Local alleging a refusal to bargain on the part of respondent. On December 31, 1952, the Board found respondent guilty of refusing to bargain with the Local.

Pursuant to respondent's policy of neutrality, after it had received the

Board's certification of the Local, respondent took steps to notify the employees of its position in three letters. In the first, dated March 21, 1952, respondent stated *inter alia:* "Because of the litigation now pending to test the certification of a collective bargaining representative of your unit by the National Labor Relations Board * * * your company is, as you know, not recognizing either union involved in the dispute. In the meantime, the company's position concerning its labor relations with you is that it will continue to deal in hours, wages and working conditions along the same lines provided for in the contract which the company now has with the employees' Independent Union. *If there is any question in your mind concerning grievances, you should know that we are handling them on an individual basis, following the procedure which is set forth in the contract—except that there is no union recognition involved. If you have a grievance, you may, as an individual, present it orally to your foreman, as you have in the past, or on forms which will be furnished to you by him."* (Emphasis suppied.)

In its letter of April 7, 1952, which dealt primarily with a certain wage increase authorized by the Wage Stabilization Board, respondent advised its employees: "This is an appropriate time to repeat that in regard to other aspects of our labor relations, we will continue to deal in hours, wages, and working conditions along the same lines that we have in our existing contracts."

Similarly, in a letter of July 2, 1952, respondent advised its employees: "* * the company will continue in its labor relations to observe the terms and conditions of existing contracts as they apply to hours, wages and working conditions."

On review we held that misconduct on the part of the Local had prevented a fair election from taking place. Kearney & Trecker Corp. v. N.L.R.B., 7 Cir., 210 F.2d 852, saying, at page 859: "Our study of this record leaves us with the firm conviction that Local 1083 was con-

ceived under a heavy cloud of suspicion and that its conduct was such as to preclude the inalienable right of the employees to select their bargaining representative in an election free from coercion and intimidation."

Against this background of bitter rivalry between the two unions, we approved the events which led to the two-week suspension of the seven employees. The episode in question occurred subsequent to the Board's certification but prior to our determination of the invalidity of the election.

Sometime during 1951, a somewhat complicated wage plan, commonly known as the Halsey 50–50 group incentive system was adopted in respondent's shipping department. Shortly thereafter, the employees in that department began to complain to their supervisory employees that they did not understand how their bonus pay was computed and why it varied from week to week. Although several attempts were made by respondent to explain the Halsey system to the men, as individuals, the Trial Examiner concluded that the men in the shipping department did not understand this complex wage plan. On the day preceding the action in question, the foreman of the department was confronted by a request from two spokesmen from the department, both of whom, incidentally, were officials of the Local. They demanded that someone explain the bonus system to them *as a group*. They were informed that they would be received individually but not as a group.

According to a prearranged plan, agreed upon by the employees in the shipping department before going to work on February 26, 1953, the men refused to return to work after their morning coffee break, and stated that they would not resume employment until someone from the company explained to them *as a group*, the operation of the bonus system. As a result of this action, seven of the men refused, on request, to return to their jobs and were laid off for two weeks as a disciplinary measure, for,

among other reasons, the improper method of presentation of a grievance.

It is to be noted at the outset, that there were several attempts by the company to explain to these employees the nature of this wage system. We need not pass on the question of how far an employer has to go in explaining a matter of this nature to his employees. For purposes of this discussion we assume that this was a valid grievance. However, attention should be given to the following statement from N.L.R.B. v. American Pearl Button Co., 8 Cir., 149 F.2d 258, 260: "Whether or not the employer in the exercise of his managerial judgment is just or unjust, wise or unwise, is not a matter of concern, and the Board's inquiry must be confined to the question as to whether or not the employees have been discriminated against * * *." See also, N.L.R.B. v. McGahey, 5 Cir., 233 F.2d 406.

▋ Likewise, contrary to dissenting member Farmer of the Board, we conclude, that, although reasonable minds might differ as to whether this was merely "another contrivance" by the Local to obtain Company recognition "in the checkered history of this controversy", the record supports the Board's conclusion that this was not an attempt by the Local to seek "backdoor" recognition. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Based on these assumptions, we are faced with the rather difficult problem of determining whether this "minority" group activity falls within the protective ambit of Sec. 7. In determining the purview of that section it is to be noted that it is implemented by Sec. 9(a), as follows: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided, That any individual employee or a group of*

*employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment."* (Emphasis supplied.) See Salt River Valley User's Ass'n v. N.L.R.B., 9 Cir., 206 F.2d 325, 328.

■ Under the statute, as interpreted in Douds v. Local 1250, Retail, etc., Store Union, 2 Cir., 173 F.2d 764 and by the Board in Federal Telephone and Radio Co., 107 N.L.R.B. 649, a grievance under Sec. 9(a) is not necessarily limited to minor matters, but may entail problems arising under a collective bargaining agreement, provided the collective bargaining representative be given an opportunity to be present. This is in conformity with the thought expressed in N.L.R.B. v. North American Aviation Co., 9 Cir., 136 F.2d 898. Thus for the purposes of understanding the application of Sec. 9(a) in conjunction with Sec. 7 in relation to the problem before us, we need not be concerned with the distinction between a "grievance" and a matter of "collective bargaining."

■ There is no doubt but that, with certain limitations, minority group activity in the presentation of a grievance is protected concerted activity within the meaning of Sec. 7. N.L.R.B. v. Buzza-Cardozo, 9 Cir., 205 F.2d 889; Modern Motors, Inc., v. N.L.R.B., 8 Cir., 198 F.2d 925; N.L.R.B. v. J. I. Case Co., Bettendorf Works, 8 Cir., 198 F.2d 919, certiorari denied 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351; N.L.R.B. v. Kennametal, Inc., 3 Cir., 182 F.2d 817. Further, " 'concerted activities for the purpose of * * * mutual aid or protection' " are not limited to union activities. Salt River Valley Water User's Ass'n v. N.L.R.B., 9 Cir., 206 F.2d 325, 328; N. L.R.B. v. Phoenix Mutual Life Ins. Co., 7 Cir., 167 F.2d 983. However, as point-

ed out, for example, in our decisions in Harnischfeger Corp. v. N.L.R.B., 7 Cir., 207 F.2d 575 and N.L.R.B. v. Indiana Desk Co., 7 Cir., 149 F.2d 987; and the decision of N.L.R.B. v. Draper Corp., 4 Cir., 145 F.2d 199, 156 A.L.R. 989, the right to engage in such concerted activity is not unlimited, and when the minority group attempts to control the actions of the majority, its action is not protected.

■ The situation with which we are confronted is rather an unusual one in that although the Local was the certified bargaining representative, the company, as stated, refused to deal with either the certified representative or the EIU pending its judicial review of the certification proceeding. Hence, there was no certified bargaining representative through whom the employees could process their grievance. Clearly, unless there were intervening policy considerations, the presentation of this grievance by the minority group was protected concerted activity.

However, where conflicting policy considerations are deemed to prevail, the right of concerted activity has, indeed, been restricted. For example, rules of an employer have been upheld which greatly restrict the carrying on of concerted activities and other protected activities within the scope of Sec. 7. In Carter Carburetor Corp. v. N.L.R.B., 8 Cir., 140 F.2d 714 it was noted that if union discussion during working hours affects the efficiency of the employees, a negating rule is reasonable. See also N. L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679; Caterpillar Tractor Co. v. N.L.R.B., 7 Cir., 230 F.2d 357; and Midland Steel Products Co. v. N.L. R.B., 6 Cir., 113 F.2d 800 where rules restricting Sec. 7 rights were upheld as reasonable. Thus, if there is a sufficient policy consideration such as maintenance of production and preservation of neutrality and plant discipline, the courts have systematically upheld rules which restrict rights which otherwise would fall within the "protective mantle" of Sec. 7.

■ Correlating these propositions with the matter at hand, we must first determine whether the Board was correct in adopting the finding of the Trial Examiner that there was no company rule to the effect that grievances would be handled on an individual rather than a group basis. We think that the Board was clearly in error in determining that no such rule existed, for such a conclusion is unsupported by the evidence. Not only were there the letters to the employees to which we have previously referred, but, also, the numerous refusals by the officials of the company to discuss the matter of the bonus system with the employees as a group. It is clear, we think, that the employer, desiring to preserve its neutrality between the two warring groups, made effective and clear its rule to avoid group recognition and to deal with individuals only.

■ Concluding that the evidence shows that there was such a rule, we come to the crucial issue of this case, to-wit: was the rule reasonable in the light of all the circumstances. Here were two rival unions fighting bitterly for the position of exclusive bargaining representative for respondent's employees. Clearly a question of representation was presented. Thus we are confronted with the doctrine established by the Board itself in Midwest Piping and Supply Co., 63 N.L.R.B. 1060, and reaffirmed in a multitude of cases by the courts, that, pending a question of representation, there is imposed on the Company the duty to remain strictly neutral. N.L.R.B. v. Knickerbocker Plastic Co., 9 Cir., 218 F.2d 917; N.L.R.B. v. Indianapolis Newspapers, 7 Cir., 210 F.2d 501; Ohio Ferro-Alloys Corp. v. N.L.R.B., 6 Cir., 213 F.2d 646; N.L.R.B. v. Stewart, 5 Cir., 207 F.2d 8; Harrison Sheet Steel Co. v. N.L.R.B., 7 Cir., 194 F.2d 407; Hoover Co. v. N.L.R.B., 6 Cir., 191 F.2d 380; N.L.R.B. v. Stowe Spinning Co., 4 Cir., 165 F.2d 609; N.L.R.B. v. Laister-Kauffmann Corp., 8 Cir., 144 F.2d 9; N.L.R.B. v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528. In N.L.R.B. v. Bradley Washfountain Co., 7 Cir.,

192 F.2d 144, 152, 153, we explicitly stated: "The cases involving the propriety of an employer's solicitation of individual employees, seem to fall into at least three classes. One involves the situation arising prior to, or during the formation of the union or during a conflict between two or more unions for the right to represent the employees. * * * In [this] situation it seems clear that the Board and the courts will examine closely the employer's conduct in order to ascertain whether interference or coercion is present. [Cases cited.] *Close scrutiny is necessary, for in such situations any employer activity which tends in the least to interfere with or coerce employees in the exercise of their rights is improper.*" (Emphasis supplied.)

■■ The real question is whether this duty of neutrality extends beyond the time of certification, when the company in good faith, is convinced that an error has been made as was the case here. Obviously the respondent was torn by the throes of a dilemma. Hence, it refused to deal with either union, or other group, pending the outcome of its review of the certification proceedings.

We hold that respondent was completely justified in establishing the rule which effectuated its policy of neutrality. That such a position is correct is to be inferred from the language of the Board itself in Midwest Piping and Supply Co., supra, where it stated: "A neutral employer, on being confronted with conflicting representation claims by two rival unions, would not negotiate a contract with one of them until its right to be recognized as the collective bargaining representative has been finally determined under the procedure *set up under the Act.*" (Emphasis supplied.) Clearly the right to refuse to recognize the validity of the Board's certification and to contest it in the courts was a right "set up under the Act", and this obligation of neutrality continued pending a review. Thus, in Norris Inc., v. N.L.R.B., 85 U.S.App.D.C. 106, 177 F.2d 26, 28, it was succinctly stated thus: "It is clear that an employer cannot be compelled to

**422**

bargain with a person claiming to be the representative of his employees, until he has had a hearing before the Board upon a complaint, and a judicial review of the action of the Board, if he desires such review."

 The conclusion, therefore, that the temporary lay-off was non-discriminatory, is inescapable. One of the reasons assigned for the lay-off was the violation of the rule against group presentation of a grievance. This rule we have held to be valid, under the existing circumstances. Hence, the lay-off was for just cause.

Accordingly, the Board's petition for enforcement is denied.